INDEPENDENCE COUNTY, ARKANSAS
CIRCUIT CLERK GREG WALLIS
FILED FOR RECORD BY
CARMEN DUNCAN D.C.

**DATE: FEBRUARY 7, 2023**

**TIME:  09:27:46**

## IN THE CIRCUIT COURT OF INDEPENDENCE COUNTY, ARKANSAS
## CIVIL DIVISION

TANYA PARKER                                                          **PLAINTIFF**

VS.                                   NO. 32CV-23-37

UNUM LIFE INSURANCE COMPANY OF
AMERICA                                                               **DEFENDANT**

### COMPLAINT

Plaintiff, Tanya Parker, by and through her attorney, Brandon Lacy of Lacy Law Firm, and

for her Complaint against Defendant, Unum Life Insurance Company of America, states as

follows:

### PARTIES, JURISDICTION & VENUE

1.      Plaintiff, Tanya Parker, is a resident of Batesville, Independence County, Arkansas.

Plaintiff is an eligible employee, participant, and beneficiary of the plan of disability benefits at

issue in this lawsuit.

2.      Defendant Unum Life Insurance Company of America ("Unum") is a foreign

corporation with a principal place of business in a state other than Arkansas.   Unum is the claim

administrator for the long term disability plan under which Tanya Parker is a participant and a

beneficiary.   As claim administrator, Unum had been granted authority by the Plan to administer,

approve, and/or deny claims for disability benefits thereunder.   Unum made the decision to deny

Plaintiff's claim for benefits, which said denial is the subject of this lawsuit.   Unum's registered

1

EXHIBIT
B

agent for service of legal process is Corporation Service Company, 300 South Spring Street, Suite 900, Little Rock, Arkansas 72201.

3.    The Defendant has had in the past, and continues to have in the present, continuous and substantial contacts with the State of Arkansas.   Defendant has engaged in systematic and continuous activity in Arkansas, thereby purposefully availing themselves of the benefits and protection of the laws of the State of Arkansas.    These contacts are sufficient to establish personal jurisdiction within the State of Arkansas.

4.    The Defendant entered into a contractual agreement with Plaintiff which was administered by Defendant.    These contacts are sufficient to establish personal jurisdiction within the State of Arkansas.

5.    Jurisdiction properly lies in this Court based upon the type and amount of relief sought.    Venue lies properly in this Court based upon the residence of this Plaintiff and the County in which a substantial part of events or omissions giving rise to the claims occurred.

6.    The Plan is a "governmental plan" as that term is defined by the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et seq. ("ERISA").    As such, it is not governed by ERISA.

## GENERAL ALLEGATIONS

7.    Plaintiff was an employee of the Arkansas Department of Human Services as a licensed practical nurse, having worked there from September 4, 2013 until her last day of actual work on June 15, 2021.

8.    As a licensed practical nurse, Plaintiff's job duties included monitoring patient conditions by checking vital signs, measuring food and liquid intake and output, responding to

2

patient requests for assistance, administering injections and oral medications, providing direct care to patients, documenting and administering medications and treatments, changes in patient conditions or behavior, etc. The job duties required Plaintiff to stand and walk most of the time while on duty, bend and stoop for a significant amount of time while on duty, as well as lift and turn patients with assistance. In addition, Plaintiff's job duties required being able to push/pull/grip up to 50 pounds. *See* Exhibit 1, Job Description.

9.      Plaintiff contracted COVID-19 on June 15, 2021. She was hospitalized for one week and was nearly intubated. She was ultimately discharged, but has had lingering symptoms thereafter including, but not limited to, shortness of breath, fatigue and cough.

10.     Due to Plaintiff's continued symptoms, Plaintiff was referred to a pulmonologist, Ladly Abraham, M.D., who advised Plaintiff to remain off work.

11.     Plaintiff continues to suffer with the above lingering symptoms and continues treatment to date.

12.     Attached as Exhibit 2 is Plaintiff's plan of long term disability insurance in which she participated and paid for while an employee of the Arkansas Department of Human Services.

13.     The Plan defines "Disability" as meaning:

You are disabled when Unum determines that:

- you are limited from performing the material and substantial duties of your regular occupation   due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

You must be under the regular care of a physician in order to be considered

3

disabled.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

14.     Plaintiff originally became eligible for long term disability benefits on December 13, 2021 after satisfying the Plan's 180-day elimination period.

15.     Plaintiff submitted her claim for long-term disability benefits to Unum by fax on March 28, 2022.

16.     Dr. Abraham completed an Attending Physician Statement on March 8, 2022 confirming that Plaintiff was disabled from performing her own occupation from June 17, 2021 until an undetermined point in the future.   *See* Exhibit 3, Attending Physician Statement.

17.     At Unum's request, Dr. Abraham submitted his Restrictions and Limitations for Plaintiff dated April 25, 2022.   Dr. Abraham restricted and limited Plaintiff from "any activity/exertion that is intolerable.   Prolonged periods of standing/walking/lifting/pushing pulling."   *See* Exhibit 4, Restrictions and Limitations Form.

18.     In reviewing whether Plaintiff would be eligible for benefits, Unum's in-house nurse consultant, Kathryn Knight, RN, performed a file review and concluded that restrictions and limitations "are not clearly supported."   *See* Exhibit 5, Clinical Analysis.

19.     Given that the medical opinions were still unclear, Unum referred Plaintiff's file to their on-site physician, Elizabeth Belanger, M.D.   Dr. Belanger authored a letter to Dr. Abraham dated April 29, 2022 outlining her own differing opinions concerning the restrictions and limitations given her review of the medical records in the claim file.   When Dr. Abraham did not respond to Dr. Belanger's letter, Dr. Belanger concluded that Plaintiff's restrictions and limitations were not supported and referred the file to a Designated Medical Officer.   *See* Exhibit 6, Doctoral

Review.

20.    The file was referred Alan Atkinson, D.O. for a medical review.  Dr. Atkinson ultimately agreed with Unum's on-site physician, Dr. Belanger, in his report dated May 24, 2022. *See* Exhibit 7, DMO Review.

21.    Despite the opinions of the only physician who has actually personally examined Plaintiff, Defendant ultimately determined that Plaintiff did not meet the definition of disability by letter dated May 27, 2022.  *See* Exhibit 8, Denial Letter.

22.    Plaintiff appealed this decision, as required by the terms of the Plan, by letter dated November 16, 2022.  In her appeal, Plaintiff noted her continued impairments as mentioned above.  *See* Exhibit 9, Appeal Letter.

23.    On December 22, 2022, Unum notified Plaintiff that it had made the decision to uphold the denial of benefits.  *See* Exhibit 10, Second Denial Letter.

## COUNT I - BREACH OF INSURANCE CONTRACT

24.    Paragraphs 1-23 are incorporated herein by reference as set forth word for word.

25.    Plaintiff is entitled to recovery against Defendant pursuant to the Plan which was in effect at the time of Plaintiff's claim for disability benefits.

26.    Because of Plaintiff's condition, she is unable to work at her own or any occupation. In addition, Plaintiff is under the regular care of her primary care physician and pulmonologist.

27.    Because Plaintiff is "disabled" as that phrase is defined within this Plan, Plaintiff is entitled to recover 60% of her pre-disability earnings, or $2,494.58, less any other income, from the date her benefits became payable (December 13, 2021) until her exhaustion of benefits date on March 12, 2037.

5

28.     The benefits due Plaintiff under this policy exceed the amount required for federal diversity jurisdiction.

29.     The failure to tender moneys to their insured pursuant to the disability provisions of the insurance contract is a breach of the contract by Defendants Insurance and entitles Plaintiff to the following:

    (a)     60% of her pre-disability earnings, or $2,494.58, less any other income, from December 13, 2021 until her exhaustion of benefits on March 12, 2037;

    (b)     12% penalty pursuant to Ark. Code Ann. § 23-79-208;

    (c)     Attorney's fees pursuant to Ark. Code Ann. § 23-79-208;

    (d)     6% prejudgment interest calculated from the date of notice of Plaintiff's claim; and

    (e)     All other costs incurred to prosecute this action.

30.     Plaintiff demands a trial by jury.

WHEREFORE, Plaintiff respectfully prays that she have and recover a judgment against the Defendant for all compensatory and punitive damages more fully described above, including attorney's fees, expenses, and costs, and for all other just and appropriate relief.

6

Respectfully submitted,

Brandon W. Lacy #2003098
**LACY LAW FIRM**
630 S. Main Street
Jonesboro, AR 72403
870-932-4522
brandon@lacylawfirm.com

Attorney for Plaintiff

By: _____
Brandon W. Lacy (2003098)

7

**Arkansas Department of Human Services**
**Functional Job Description**

| | | | | |
|---|---|---|---|---|
| **Division/Office** | Division of Developmental Disabilites Svcs | **County** | Faulkner | |
| **Position Number** | | **Class Code** L069C | **Grade** | GS06 |
| **OPM Job Title** | Licensed Practical Nurse | | | |
| **Functional Title** | Licensed Practical Nurse | | | |

**Agency Number (4 digits)** ___0710___  **Cost Center (6 digits)** _____  **Internal Order Number** _____

**Minimum Qualifications (from OPM Job Specification):**
The formal education equivalent of a diploma or certificate with the prescribed curriculum in a state approved program for the preparation of practical nurses. Additional requirements determined by the agency for recruiting purposes require review and approval by the Office of Personnel Management. OTHER JOB RELATED EDUCATION AND/OR EXPERIENCE MAY BE SUBSTITUTED FOR ALL OR PART OF THESE BASIC REQUIREMENTS, EXCEPT FOR CERTIFICATION OR LICENSURE REQUIREMENTS, UPON APPROVAL OF THE QUALIFICATIONS REVIEW COMMITTEE.
Licenses
Must be licensed as a Licensed Practical Nurse by the Arkansas State Nursing Board in accordance with ACA 17-87-304.

**Job Summary**
The Licensed Practical Nurse is responsible for providing direct care to patients in private homes, hospitals, clinics and reisdential institutions.  This position is governed by state and federal laws and agency/institution policy.

**Job Duties & Responsibilities**
1.  Monitors patient's condition by checking vital signs, measuring food and liquid intake and output, repsonding to patients requests for assistance and making rounds to observe patients.

2.  Administers injections and oral medications as directed by physician.

3.  Provides direct care to patients including caring for colostomies and tracheotomies, mixing medications and food; inserting feeding tubes, catheterizing patients and performing other nursing duties.

4.  Documents and administers medications and treatments, changes in patient's condition or behavior and response to care.

5.  Teaches patients and/or their families how to care for their medical needs including catheter and colostomy care, bowel program techniques, insulin injection, personal hygiene and skin care.

6.  Assists physician in clinic by gathering information on patient's needs and informing physician; dressing and undressing patient, assisting with medical procedures and transcribing physician's orders.

7.  Counts and logs usage of controlled drugs.

8.  Obtains specimens for laboratory analysis by venipuncture, swabbing or other means.

9.  Responds to all emergency or life-threatening situations and administers appropriate treatment.

10.  Performs related responsibilities as required or assigned.

DHS-1158 (R.7/07)

**EXHIBIT**
**1**

AMENDMENT NO. 10

This amendment forms a part of Group Policy No. 410275 001 issued to the Policyholder:

Arkansas State Employees

The entire policy is replaced by the policy attached to this amendment.

The effective date of these changes is December 1, 2021. The changes only apply to disabilities which start on or after the effective date.

The policy's terms and provisions will apply other than as stated in this amendment.

Dated at Portland, Maine on August 19, 2021.

Unum Life Insurance Company of America

By

Secretary

If this amendment is unacceptable, please sign below and return this amendment to Unum Life Insurance Company of America at Portland, Maine within 90 days of August 19, 2021.

YOUR FAILURE TO SIGN AND RETURN THIS AMENDMENT BY THAT DATE WILL CONSTITUTE ACCEPTANCE OF THIS AMENDMENT.

Arkansas State Employees

By _____
Signature and Title of Officer

EXHIBIT
2

C.AMEND-1                    AMEND-1 (12/1/2021)



**DISABILITY INCOME
GROUP INSURANCE POLICY
NON-PARTICIPATING**

**POLICYHOLDER:**   Arkansas State Employees

**POLICY NUMBER:**   410275 001

**POLICY EFFECTIVE DATE:**   December 1, 2015

**POLICY ANNIVERSARY DATE:** December 1

**GOVERNING JURISDICTION:**   Arkansas

Unum Life Insurance Company of America (referred to as Unum) will provide benefits under this policy. Unum makes this promise subject to all of this policy's provisions.

The policyholder should read this policy carefully and contact Unum promptly with any questions. This policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments. This policy consists of:

- all policy provisions and any amendments and/or attachments issued;
- employees' signed applications; and
- the certificate of coverage.

This policy may be changed in whole or in part. Only an officer of Unum can approve a change. The approval must be in writing and endorsed on or attached to this policy. No other person, including a broker, may change this policy or waive any part of it.

Signed for Unum at Portland, Maine on the Policy Effective Date.

President                           Secretary

**Unum Life Insurance Company of America
2211 Congress Street
Portland, Maine 04122**

C.FP-1                      C.FP-1  (12/1/2021)

# TABLE OF CONTENTS

BENEFITS AT A GLANCE ............................................................................B@G-LTD-1

LONG TERM DISABILITY PLAN ................................................................B@G-LTD-1

CLAIM INFORMATION .................................................................................LTD-CLM-1

LONG TERM DISABILITY ...........................................................................LTD-CLM-1

POLICYHOLDER PROVISIONS .................................................................EMPLOYER-1

CERTIFICATE SECTION ..............................................................................CC.FP-1

GENERAL PROVISIONS ............................................................................EMPLOYEE-1

LONG TERM DISABILITY .............................................................................LTD-BEN-1

BENEFIT INFORMATION ............................................................................LTD-BEN-1

OTHER BENEFIT FEATURES ....................................................................LTD-OTR-1

STATE REQUIREMENTS .............................................................................STATE REQ-1

OTHER SERVICES ......................................................................................SERVICES-1

GLOSSARY ....................................................................................................GLOSSARY-1

TOC-1  (12/1/2021)

# BENEFITS AT A GLANCE

## LONG TERM DISABILITY PLAN

This long term disability plan provides financial protection for you by paying a portion of your income while you are disabled. In some cases, you can receive disability payments even if you work while you are disabled.

EMPLOYER'S ORIGINAL PLAN
EFFECTIVE DATE:      December 1, 2015

POLICY NUMBER:      410275  001

ELIGIBLE GROUP(S):

      All full-time and part-time employees in active employment in the United States with the Employer

MINIMUM HOURS REQUIREMENT:

      Employees must be in active employment at least 20 hours per week.

WAITING PERIOD:

      For employees in an eligible group on or before December 1, 2015:  None

      For employees entering an eligible group after December 1, 2015:  First of the month following the date the employee elects coverage

      Employees are not eligible for coverage until the waiting period has been completed.  You must be in continuous active employment in an eligible group during the specified waiting period.

ENROLLMENT:

      Employees who are eligible may apply for their coverage at any time.

      You may cancel any coverage for which you make contributions at any time.

EVIDENCE OF INSURABILITY:

      Evidence of insurability is required:

      - for any amount of coverage applied for more than 31 days after you are first eligible for coverage.
      - if you reapply for coverage after it terminates.

WHO PAYS FOR THE COVERAGE:

    All full-time and part-time employees
      Option 1

      You must make contributions for your coverage.

      No premium contributions are required for your coverage while you are receiving benefit payments under this plan.

      Option 2

      You must make contributions for your coverage.

      No premium contributions are required for your coverage while you are receiving benefit payments under this plan.

B@G-LTD-1 (12/1/2021)

Option 3

You must make contributions for your coverage.

No premium contributions are required for your coverage while you are receiving benefit payments under this plan.

Option 4

No coverage

All employees who selected the 25% option prior to 12/1/17 (closed group)
You must make contributions for your coverage.

No premium contributions are required for your coverage while you are receiving benefit payments under this plan.

ELIMINATION PERIOD:

180 days

Benefits begin the day after the elimination period is completed.

MONTHLY BENEFIT:

Option 1

60% of monthly earnings to a maximum benefit of $5,000 per month.

Your payment may be reduced by deductible sources of income and disability earnings. Some disabilities may not be covered or may have limited coverage under this plan.

Option 2

60% of monthly earnings to a maximum benefit of $5,000 per month.

Your payment may be reduced by disability earnings. Some disabilities may not be covered or may have limited coverage under this plan.

Option 3

50% of monthly earnings to a maximum benefit of $5,000 per month.

Your payment may be reduced by deductible sources of income and disability earnings. Some disabilities may not be covered or may have limited coverage under this plan.

Option 4

No coverage

All employees who selected the 25% option prior to 12/1/17 (closed group)
25% of monthly earnings to a maximum benefit of $5,000 per month.

Your payment may be reduced by disability earnings. Some disabilities may not be covered or may have limited coverage under this plan.

MINIMUM MONTHLY BENEFIT:

All full-time and part-time employees
The greater of:

- $100; or
- 10% of your gross disability payment.

B@G-LTD-2  (12/1/2021)

MAXIMUM PERIOD OF PAYMENT:

    All full-time and part-time employees
      Option 1

| Age at Disability | Maximum Period of Payment |
|---|---|
| Less than Age 62 | To Social Security Normal Retirement Age |
| Age 62 | 60 months |
| Age 63 | 48 months |
| Age 64 | 42 months |
| Age 65 | 36 months |
| Age 66 | 30 months |
| Age 67 | 24 months |
| Age 68 | 18 months |
| Age 69 or older | 12 months |

| Year of Birth | Social Security Normal Retirement Age |
|---|---|
| 1937 or before | 65 years |
| 1938 | 65 years 2 months |
| 1939 | 65 years 4 months |
| 1940 | 65 years 6 months |
| 1941 | 65 years 8 months |
| 1942 | 65 years 10 months |
| 1943-1954 | 66 years |
| 1955 | 66 years 2 months |
| 1956 | 66 years 4 months |
| 1957 | 66 years 6 months |
| 1958 | 66 years 8 months |
| 1959 | 66 years 10 months |
| 1960 and after | 67 years |

    Options 2 and 3

| Age at Disability | Maximum Period of Payment |
|---|---|
| Less than age 65 | 5 years |
| Age 65 through 68 | To age 70, but not less than 1 year |
| Age 69 and over | 1 year |

    Option 4

    No coverage

All employees who selected the 25% option prior to 12/1/17 (closed group)

| Age at Disability | Maximum Period of Payment |
|---|---|
| Less than Age 62 | To Social Security Normal Retirement Age |
| Age 62 | 60 months |
| Age 63 | 48 months |
| Age 64 | 42 months |
| Age 65 | 36 months |
| Age 66 | 30 months |
| Age 67 | 24 months |
| Age 68 | 18 months |
| Age 69 or older | 12 months |

| Year of Birth | Social Security Normal Retirement Age |
|---|---|
| 1937 or before | 65 years |
| 1938 | 65 years 2 months |
| 1939 | 65 years 4 months |
| 1940 | 65 years 6 months |
| 1941 | 65 years 8 months |
| 1942 | 65 years 10 months |
| 1943-1954 | 66 years |
| 1955 | 66 years 2 months |
| 1956 | 66 years 4 months |
| 1957 | 66 years 6 months |

B@G-LTD-3  (12/1/2021)

| | |
|---|---|
| 1958 | 66 years 8 months |
| 1959 | 66 years 10 months |
| 1960 and after | 67 years |

OTHER FEATURES:

Dependent Care Expense Benefit

Pre-Existing: 3/12

Rehabilitation and Return to Work Assistance Benefit

Survivor Benefit

Work Life Assistance Program

The above items are only highlights of this plan. For a full description of your coverage, continue reading your certificate of coverage and if you make contributions to the plan, refer to your confirmation of coverage. The plan includes enrollment, risk management and other support services related to your Employer's benefit program.

**B@G-LTD-4  (12/1/2021)**

# CLAIM INFORMATION

# LONG TERM DISABILITY

## WHEN DO YOU NOTIFY UNUM OF A CLAIM?

We encourage you to notify us of your claim as soon as possible so that a claim decision can be made in a timely manner. Notice of claim should be sent within 30 days after the date your disability begins. In addition, you must send Unum proof of your claim no later than one year after the date your disability begins unless your failure to do so is due to your lack of legal capacity. In no event can proof of your claim be submitted after the expiration of the time limit for commencing a legal proceeding as stated in this policy, even if your failure to provide proof of claim is due to a lack of legal capacity or if state law provides an exception to the one year time period.

You must notify us immediately when you return to work in any capacity.

## HOW DO YOU FILE PROOF OF CLAIM?

You and your Employer must fill out your own sections of the claim form and then give it to your attending physician. Your physician should fill out his or her section of the form and send it directly to Unum.

The form to use to submit your proof of claim is available from your Employer, or you can request the form from us. If you do not receive the form from Unum or your Employer within 15 days of your request, send Unum proof of claim without waiting for the form.

## WHAT INFORMATION IS NEEDED AS PROOF OF YOUR CLAIM?

All full-time and part-time employees
Proof of your claim, provided at your expense, must show:

- the date your disability began;
- the existence and cause of your sickness or injury;
- that your sickness or injury causes you to have limitations on your functioning and restrictions on your activities preventing you from performing the material and substantial duties of your regular occupation or of any other gainful occupation for which you are reasonably fitted by education, training, or experience;
- that you are under the regular care of a physician;
- the name and address of any hospital or institution where you received treatment, including all attending physicians; and
- the appropriate documentation of your monthly earnings, any disability earnings, and any deductible sources of income.

In some cases, you will be required to give Unum authorization to obtain additional medical information and to provide non-medical information as part of your proof of claim, or proof of continuing disability. We may also require that you send us appropriate financial records, which may include income tax returns, which we believe are necessary to substantiate your income. We may request that you send periodic proof of your claim. This proof, provided at your expense, must be received within 45 days of a request by us. Unum will deny your claim, or stop sending you payments, if the appropriate information is not submitted.

LTD-CLM-1 (12/1/2021)

We may require you to be examined by a physician, other medical practitioner and/or vocational expert of our choice. Unum will pay for this examination. We can require an examination as often as it is reasonable to do so. We may also require you to meet with and be interviewed by an authorized Unum Representative. Unum will deny your claim, or stop sending you payments, if you fail to comply with our requests.

**All employees who selected the 25% option prior to 12/1/17 (closed group)**
Proof of your claim, provided at your expense, must show:

- the date your disability began;
- the existence and cause of your sickness or injury;
- that your sickness or injury causes you to have limitations on your functioning and restrictions on your activities preventing you from performing the material and substantial duties of your regular occupation or of any other gainful occupation for which you are reasonably fitted by education, training, or experience;
- that you are under the regular care of a physician;
- the name and address of any hospital or institution where you received treatment, including all attending physicians; and
- the appropriate documentation of your monthly earnings and any disability earnings.

In some cases, you will be required to give Unum authorization to obtain additional medical information and to provide non-medical information as part of your proof of claim, or proof of continuing disability. We may also require that you send us appropriate financial records, which may include income tax returns, which we believe are necessary to substantiate your income. We may request that you send periodic proof of your claim. This proof, provided at your expense, must be received within 45 days of a request by us. Unum will deny your claim, or stop sending you payments, if the appropriate information is not submitted.

We may require you to be examined by a physician, other medical practitioner and/or vocational expert of our choice. Unum will pay for this examination. We can require an examination as often as it is reasonable to do so. We may also require you to meet with and be interviewed by an authorized Unum Representative. Unum will deny your claim, or stop sending you payments, if you fail to comply with our requests.

## TO WHOM WILL UNUM MAKE PAYMENTS?

Unum will make payments to you.

## WHAT HAPPENS IF UNUM OVERPAYS YOUR CLAIM?

**All full-time and part-time employees**
Unum has the right to recover any overpayments due to:

- fraud;
- any error Unum makes in processing a claim;
- disability earnings; or
- deductible sources of income.

LTD-CLM-2  (12/1/2021)

You must reimburse us in full. We will determine the method by which the repayment is to be made which may include reducing or withholding future payments including the minimum monthly payment.

Unum will not recover more money than the amount we paid you.

Any unpaid premium due for your coverage under this policy may be recovered by us by offsetting against amounts otherwise payable to you under this policy, or by other legally permitted means.

All employees who selected the 25% option prior to 12/1/17 (closed group) Unum has the right to recover any overpayments due to:

- fraud;
- any error Unum makes in processing a claim; or
- disability earnings.

You must reimburse us in full. We will determine the method by which the repayment is to be made which may include reducing or withholding future payments including the minimum monthly payment.

Unum will not recover more money than the amount we paid you.

Any unpaid premium due for your coverage under this policy may be recovered by us by offsetting against amounts otherwise payable to you under this policy, or by other legally permitted means.

**LTD-CLM-3  (12/1/2021)**

# POLICYHOLDER PROVISIONS

**WHAT IS THE COST OF THIS INSURANCE?**

## LONG TERM DISABILITY

The initial premium for each plan is based on the initial rate(s) shown in the Rate Information Amendment(s).

### WAIVER OF PREMIUM

Unum does not require premium payments for an insured while he or she is receiving Long Term Disability benefit payments under this plan.

### INITIAL RATE GUARANTEE AND RATE CHANGES

Refer to the Rate Information Amendment(s).

**WHEN IS PREMIUM DUE FOR THIS POLICY?**

Premium Due Dates:  Premium due dates are based on the Premium Due Dates shown in the Rate Information Amendment(s).

The Policyholder must send all premiums to Unum on or before their respective due date.  The premium must be paid in United States dollars.

**WHEN ARE INCREASES OR DECREASES IN PREMIUM DUE?**

Premium increases or decreases are due on the next premium due date following the change.  Changes will not be pro-rated daily.

Unum will only adjust premium for the current policy year and the prior policy year. In the case of fraud, premium adjustments will be made for all policy years.

**WHAT INFORMATION DOES UNUM REQUIRE FROM THE POLICYHOLDER?**

The Policyholder must provide Unum with the following on a regular basis:

- information about employees:
  ☐ who are eligible to become insured;
  ☐ whose amounts of coverage change; and/or
  ☐ whose coverage ends;
- occupational information and any other information that may be required to manage a claim; and
- any other information that may be reasonably required.

Policyholder records that, in Unum's opinion, have a bearing on this policy will be available for review by Unum at any reasonable time.

Clerical error or omission by Unum will not:

- prevent an employee from receiving coverage;
- affect the amount of an insured's coverage; or

**EMPLOYER-1 (12/1/2021)**

- cause an employee's coverage to begin or continue when the coverage would not otherwise be effective.

WHO CAN CANCEL OR MODIFY THIS POLICY OR A PLAN UNDER THIS POLICY?

This policy or a plan under this policy can be cancelled:

- by Unum; or
- by the Policyholder.

Unum may cancel or modify this policy or a plan if:

- our participation requirements are not met, as applicable;
- the Policyholder does not promptly provide Unum with information that is reasonably required;
- the Policyholder fails to perform any of its obligations that relate to this policy;
- the premium is not paid in accordance with the provisions of this policy that specify whether the Policyholder, the employee, or both, pay(s) the premiums;
- the Policyholder does not promptly report to Unum the names of any employees who are added or deleted from the eligible group;
- Unum determines that there is a significant change, in the size, occupation or age of the eligible group as a result of a corporate transaction such as a merger, divestiture, acquisition, sale or reorganization of the Policyholder and/or its employees; or
- a change in federal or state law or regulation substantially impacts this policy or its risks insured.

If Unum cancels or modifies this policy or a plan, for any of the reasons listed above, a written notice will be delivered to the Policyholder at least 31 days prior to the cancellation date or modification date. The Policyholder may cancel this policy or a plan if the modifications are unacceptable.

If any premium is not paid during the 45 day grace period, this policy or plan will terminate automatically at the end of the grace period. The Policyholder is liable for premium for coverage during the grace period. The Policyholder must pay Unum for premium due for the full period this policy is in force. In the event of termination, this policy or plan may be reinstated only as agreed upon by Unum and the Policyholder. If Unum agrees to reinstate this policy or plan, such reinstatement will not constitute waiver of the termination provision in the future.

The Policyholder may cancel this policy or a plan by written notice delivered to Unum at least 31 days prior to the cancellation date. When both the Policyholder and Unum agree, this policy or a plan can be cancelled on an earlier date. If Unum or the Policyholder cancels this policy or a plan, coverage will end at 12:00 midnight on the last day of coverage.

If this policy or a plan is cancelled, the cancellation will not affect a payable claim.

DIVISIONS, SUBSIDIARIES OR AFFILIATED COMPANIES INCLUDE:

All divisions, subsidiaries, and affiliated companies of the named Policyholder for whose employees premium is being paid.

EMPLOYER-2  (12/1/2021)

OPEN ENROLLMENT:

**All full-time and part-time employees**
**There will be an open enrollment period starting on August 16, 2021 and ending on**
**October 15, 2021 for late applicants.  Evidence of insurability will not be required**
**during this open enrollment period for late applicants, excluding those employees**
**whose evidence of insurability form was previously disapproved.  The effective date**
**of insurance for employees who enroll in the plan during the open enrollment period**
**will be December 1, 2021.**

**EMPLOYER-3  (12/1/2021)**

# CERTIFICATE SECTION

Unum Life Insurance Company of America (referred to as Unum) welcomes you as a client.

This is your certificate of coverage as long as you are eligible for coverage and you become insured. You will want to read it carefully and keep it in a safe place.

Unum has written your certificate of coverage in plain English. However, a few terms and provisions are written as required by insurance law. If you have any questions about any of the terms and provisions, please consult Unum's claims paying office. Unum will assist you in any way to help you understand your benefits.

If the terms and provisions of the certificate of coverage (issued to you) are different from the policy (issued to the policyholder), the policy will govern. Your coverage may be cancelled or changed in whole or in part under the terms and provisions of the policy.

The policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments.

For purposes of effective dates and ending dates under the group policy, all days begin at 12:01 a.m. and end at 12:00 midnight at the Policyholder's address.

**Unum Life Insurance Company of America**
**2211 Congress Street**
**Portland, Maine 04122**

CC.FP-1  (12/1/2021)

# GENERAL PROVISIONS

## WHAT IS THE CERTIFICATE OF COVERAGE?

This certificate of coverage is a written statement prepared by Unum and may include attachments.  It tells you:

- the coverage for which you may be entitled;
- to whom Unum will make a payment; and
- the limitations, exclusions and requirements that apply within a plan.

## WHEN ARE YOU ELIGIBLE FOR COVERAGE?

If you are working for your Employer in an eligible group, the date you are eligible for coverage is the later of:

- the plan effective date; or
- the day after you complete your waiting period.

## WHEN DOES YOUR COVERAGE BEGIN?

**All full-time and part-time employees**
Your coverage will begin at 12:01 a.m. on the first of the month coincident with or next following the latest of:

- the date you are eligible for coverage;
- the date you apply for coverage; or
- the date Unum approves your application, if evidence of insurability is required.

**All employees who selected the 25% option prior to 12/1/17 (closed group)**
Your coverage will begin at 12:01 a.m. on the first of the month coincident with or next following the date you are eligible for coverage.

## WHEN CAN YOU APPLY FOR COVERAGE IF YOU DID NOT APPLY OR DECLINED WHEN YOU WERE FIRST ELIGIBLE FOR COVERAGE OR YOU VOLUNTARILY CANCELLED YOUR COVERAGE?

You can apply for coverage at any time.  Evidence of insurability is required.  Your coverage will begin at 12:01 a.m. on the first of the month coincident with or next following the date Unum approves your application.

An evidence of insurability form can be obtained from your Employer.

## WHAT IF YOU ARE ABSENT FROM WORK ON THE DATE YOUR COVERAGE WOULD NORMALLY BEGIN?

If you are absent from work due to injury, sickness, temporary layoff or leave of absence, your coverage will begin on the first of the month coincident with or next following the date you return to active employment.

EMPLOYEE-1  (12/1/2021)

## ONCE YOUR COVERAGE BEGINS, WHAT HAPPENS IF YOU ARE TEMPORARILY NOT WORKING?

If you are on a temporary layoff, and if premium is paid, you will be covered through the end of the month that immediately follows the month in which your temporary layoff begins.

If you are on a leave of absence, other than a family and medical leave, and if premium is paid, you will be covered through the end of the month that immediately follows the month in which your leave of absence begins.

## WHAT HAPPENS TO YOUR COVERAGE UNDER THIS POLICY WHILE YOU ARE ON A FAMILY AND MEDICAL LEAVE OF ABSENCE?

We will continue your coverage in accordance with your Employer's Human Resource policy on family and medical leaves of absence if premium payments continue and your Employer has approved your leave in writing.

Your coverage will be continued until the end of the later of:

1. the leave period required by the federal Family and Medical Leave Act of 1993 and any amendments; or
2. the leave period required by applicable state law.

If your Employer's Human Resource policy doesn't provide for continuation of your coverage during a family and medical leave of absence, your coverage will be reinstated when you return to active employment.

We will not:

- apply a new waiting period;
- apply a new pre-existing condition exclusion; or
- require evidence of insurability.

## WHEN WILL CHANGES MADE BY YOUR EMPLOYER TAKE EFFECT?

Once your coverage begins, any change requested by your Employer will take effect on the first of the month coincident with or next following the date the change occurs if you are in active employment.

If you are not in active employment due to injury or sickness, or if you are on a covered layoff or leave of absence, any change requested by your Employer will begin on the first of the month coincident with or next following the date you return to active employment.

Any decrease in coverage will take effect immediately but will not affect a payable claim that occurs prior to the effective date of the change.

## WHEN DOES YOUR COVERAGE END?

If you choose to cancel your coverage under the policy or a plan, your coverage ends on the first of the month following the date you provide notification to your Employer.

EMPLOYEE-2 (12/1/2021)

Otherwise, your coverage under the policy or a plan ends on the earliest of the following:

- the date the policy or a plan is cancelled;
- the date you no longer are in an eligible group;
- the date your eligible group is no longer covered;
- the last day of the period for which you made any required contributions; or
- the last day you are in active employment.

However, as long as premium is paid as required, coverage will continue:

- while benefits are being paid;
- while you are fulfilling the requirements of your elimination period; or
- in accordance with the layoff and leave of absence provisions of this policy or plan.

Unum will provide coverage for a payable claim which occurs while you are covered under the policy or plan.

## WHAT ARE THE TIME LIMITS FOR LEGAL PROCEEDINGS?

You can start legal action regarding your claim 60 days after proof of claim has been given and up to 3 years from the later of when original proof of your claim was first required to have been given; or your claim was denied; or your benefits were terminated, unless otherwise provided under federal law.

## HOW CAN STATEMENTS MADE IN YOUR APPLICATION FOR THIS COVERAGE BE USED?

Unum considers any statements you make in a signed application for coverage or evidence of insurability form, or that your Employer makes in the application process, a representation and not a warranty. If any of the statements you or your Employer make are not complete and/or not true at the time they are made, we can:

- reduce or deny any claim; or
- cancel your coverage from the original effective date.

As a basis for doing this, we will use only statements made by the Employer in the application process or statements made by you in a signed application or evidence of insurability form.

If the Employer gives us information about you that is incorrect, we will:

- use the facts to decide whether you have coverage under the plan and in what amounts; and
- make a fair adjustment of the premium.

## HOW MAY UNUM COMMUNICATE WITH YOU OR YOUR EMPLOYER?

Unum may provide notices, information and other communications to you or your Employer in written, electronic or telephonic form.

EMPLOYEE-3  (12/1/2021)

## HOW WILL UNUM HANDLE INSURANCE FRAUD?

Unum wants to ensure you and your Employer do not incur additional insurance costs as a result of the undermining effects of insurance fraud. Unum promises to focus on all means necessary to support fraud detection, investigation, and prosecution.

It is a crime if you knowingly, and with intent to injure, defraud or deceive Unum, or provide any information, including filing a claim, that contains any false, incomplete or misleading information. These actions, as well as submission of materially false information, will result in denial of your claim, and are subject to prosecution and punishment to the full extent under state and/or federal law. Unum will pursue all appropriate legal remedies in the event of insurance fraud.

## DOES THE POLICY REPLACE OR AFFECT ANY WORKERS' COMPENSATION OR STATE DISABILITY INSURANCE?

The policy does not replace or affect the requirements for coverage by any workers' compensation or state disability insurance.

## DOES YOUR EMPLOYER ACT AS YOUR AGENT OR UNUM'S AGENT?

For purposes of the policy, your Employer acts on its own behalf or as your agent. Under no circumstances will your Employer be deemed the agent of Unum.

**EMPLOYEE-4  (12/1/2021)**

# LONG TERM DISABILITY

# BENEFIT INFORMATION

## HOW DOES UNUM DEFINE DISABILITY?

You are disabled when Unum determines that:

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

You must be under the regular care of a physician in order to be considered disabled.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

## HOW LONG MUST YOU BE DISABLED BEFORE YOU ARE ELIGIBLE TO RECEIVE BENEFITS?

You must be continuously disabled through your elimination period. Unum will treat your disability as continuous if your disability stops for 30 days or less during the elimination period. The days that you are not disabled will not count toward your elimination period.

Your elimination period is 180 days.

You are not required to have a 20% or more loss in your indexed monthly earnings due to the same injury or sickness to be considered disabled during the elimination period.

## CAN YOU SATISFY YOUR ELIMINATION PERIOD IF YOU ARE WORKING?

Yes. If you are working while you are disabled, the days you are disabled will count toward your elimination period.

## WHEN WILL YOU BEGIN TO RECEIVE PAYMENTS?

You will begin to receive payments when we approve your claim, providing the elimination period has been met and you are disabled. We will send you a payment monthly for any period for which Unum is liable.

LTD-BEN-1  (12/1/2021)

## HOW MUCH WILL UNUM PAY YOU IF YOU ARE DISABLED?

We will follow this process to figure your payment:

**All full-time and part-time employees**
**OPTION 1**

1. Multiply your monthly earnings by 60%.
2. The maximum monthly benefit is $5,000.
3. Compare the answer from Item 1 with the maximum monthly benefit. The lesser of these two amounts is your gross disability payment.
4. Subtract from your gross disability payment any deductible sources of income.

The amount figured in Item 4 is your monthly payment.

Your monthly payment may be reduced based on your disability earnings.

If, at any time after the elimination period, you are disabled for less than 1 month, we will send you 1/30 of your monthly payment for each day of disability and 1/30 of any additional benefits for each day of disability.

**OPTION 2**

1. Multiply your monthly earnings by 60%.
2. The maximum monthly benefit is $5,000.
3. Compare the answer from Item 1 with the maximum monthly benefit. The lesser of these two amounts is your gross disability payment.
4. Subtract from your gross disability payment any deductible sources of income.

The amount figured in Item 4 is your monthly payment.

Your monthly payment may be reduced based on your disability earnings.

If, at any time after the elimination period, you are disabled for less than 1 month, we will send you 1/30 of your monthly payment for each day of disability and 1/30 of any additional benefits for each day of disability.

**OPTION 3**

1. Multiply your monthly earnings by 50%.
2. The maximum monthly benefit is $5,000.
3. Compare the answer from Item 1 with the maximum monthly benefit. The lesser of these two amounts is your gross disability payment.
4. Subtract from your gross disability payment any deductible sources of income.

The amount figured in Item 4 is your monthly payment.

Your monthly payment may be reduced based on your disability earnings.

If, at any time after the elimination period, you are disabled for less than 1 month, we will send you 1/30 of your monthly payment for each day of disability and 1/30 of any additional benefits for each day of disability.

LTD-BEN-2  (12/1/2021)

**OPTION 4**

No Coverage

All employees who selected the 25% option prior to 12/1/17 (closed group)
1. Multiply your monthly earnings by 25%.
2. The maximum monthly benefit is $5,000.
3. Compare the answer from Item 1 with the maximum monthly benefit. The lesser of these two amounts is your gross disability payment.

The amount figured in Item 3 is your monthly payment.

Your monthly payment may be reduced based on your disability earnings.

If, at any time after the elimination period, you are disabled for less than 1 month, we will send you 1/30 of your monthly payment for each day of disability and 1/30 of any additional benefits for each day of disability.

## WILL UNUM EVER PAY MORE THAN 100% OF MONTHLY EARNINGS?

The total benefit payable to you on a monthly basis (including all benefits provided under this plan) will not exceed 100% of your monthly earnings. However, if you are participating in Unum's Rehabilitation and Return to Work Assistance program, the total benefit payable to you on a monthly basis (including all benefits provided under this plan) will not exceed 110% of your monthly earnings.

## WHAT ARE YOUR MONTHLY EARNINGS?

"Monthly Earnings" means your gross monthly income from your Employer, including shift differential, in effect just prior to your date of disability. It includes your total income before taxes. It is prior to any deductions made for pre-tax contributions to a qualified deferred compensation plan, Section 125 plan or flexible spending account. It does not include income received from commissions, bonuses, overtime pay or any other extra compensation or income received from sources other than your Employer.

## WHAT WILL WE USE FOR MONTHLY EARNINGS IF YOU BECOME DISABLED DURING A COVERED LAYOFF OR LEAVE OF ABSENCE?

If you become disabled while you are on a covered layoff or leave of absence, we will use your monthly earnings from your Employer in effect just prior to the date your absence begins.

## HOW MUCH WILL UNUM PAY YOU IF YOU ARE DISABLED AND WORKING?

We will send you the monthly payment if you are disabled and your monthly disability earnings, if any, are less than 20% of your indexed monthly earnings, due to the same sickness or injury.

If you are disabled and your monthly disability earnings are from 20% through 80% of your indexed monthly earnings, due to the same sickness or injury, Unum will figure your payment as follows:

LTD-BEN-3  (12/1/2021)

During the first 12 months of payments, while working, your monthly payment will not be reduced as long as disability earnings plus the gross disability payment does not exceed 100% of indexed monthly earnings.

1. Add your monthly disability earnings to your gross disability payment.
2. Compare the answer in Item 1 to your indexed monthly earnings.

If the answer from Item 1 is less than or equal to 100% of your indexed monthly earnings, Unum will not further reduce your monthly payment.

If the answer from Item 1 is more than 100% of your indexed monthly earnings, Unum will subtract the amount over 100% from your monthly payment.

After 12 months of payments, while working, you will receive payments based on the percentage of income you are losing due to your disability.

1. Subtract your disability earnings from your indexed monthly earnings.
2. Divide the answer in Item 1 by your indexed monthly earnings. This is your percentage of lost earnings.
3. Multiply your monthly payment by the answer in Item 2.

This is the amount Unum will pay you each month.

As part of your proof of disability earnings, we can require that you send us appropriate financial records, which may include income tax returns, which we believe are necessary to substantiate your income.

After the elimination period, if you are disabled for less than 1 month, we will send you 1/30 of your payment for each day of disability.

## HOW DO WE PROTECT YOU IF YOUR DISABILITY EARNINGS FLUCTUATE?

If your disability earnings have fluctuated from month to month, Unum may determine your benefit eligibility based on the average of your disability earnings over the most recent 3 months.

## WHAT ARE DEDUCTIBLE SOURCES OF INCOME?

Unum will subtract from your gross disability payment the following deductible sources of income:

All full-time and part-time employees
1. The amount that you receive or are entitled to receive as disability income or disability retirement payments under any:

    - state compulsory benefit act or law.
    - other group insurance plan.
    - governmental retirement system.

2. The amount that you, your spouse and your children receive or are entitled to receive as disability payments because of your disability under:

    - the United States Social Security Act.
    - the Canada Pension Plan.

LTD-BEN-4  (12/1/2021)

- the Quebec Pension Plan.
- any similar plan or act.

3. The amount that you receive as retirement payments or the amount your spouse and children receive as retirement payments because you are receiving retirement payments under:

- the United States Social Security Act.
- the Canada Pension Plan.
- the Quebec Pension Plan.
- any similar plan or act.

4. The amount that you receive as retirement payments under any governmental retirement system. Retirement payments do not include payments made at the later of age 62 or normal retirement age under your Employer's retirement plan which are attributable to contributions you made on a post tax basis to the system.

Regardless of how retirement payments are distributed, Unum will consider payments attributable to your post tax contributions to be distributed throughout your lifetime.

Amounts received do not include amounts rolled over or transferred to any eligible retirement plan. Unum will use the definition of eligible retirement plan as defined in Section 402 of the Internal Revenue Code including any future amendments which affect the definition.

5. The amount that you:

- receive as disability payments under your Employer's retirement plan.
- voluntarily elect to receive as retirement payments under your Employer's retirement plan.
- receive as retirement payments when you reach the later of age 62 or normal retirement age, as defined in your Employer's retirement plan.

Disability payments under a retirement plan will be those benefits which are paid due to disability and do not reduce the retirement benefit which would have been paid if the disability had not occurred.

Retirement payments will be those benefits which are based on your Employer's contribution to the retirement plan. Disability benefits which reduce the retirement benefit under the plan will also be considered as a retirement benefit.

Regardless of how the retirement funds from the retirement plan are distributed, Unum will consider your and your Employer's contributions to be distributed simultaneously throughout your lifetime.

Amounts received do not include amounts rolled over or transferred to any eligible retirement plan. Unum will use the definition of eligible retirement plan as defined in Section 402 of the Internal Revenue Code including any future amendments which affect the definition.

LTD-BEN-5  (12/1/2021)

6. The amount that you receive under Title 46, United States Code Section 688 (The Jones Act).

With the exception of retirement payments, Unum will only subtract deductible sources of income which are payable for the same period of disability for which we are paying benefits.

We will not reduce your payment by your Social Security retirement income if your disability begins after age 65 and you were already receiving Social Security retirement payments.

## WHAT ARE NOT DEDUCTIBLE SOURCES OF INCOME?

All full-time and part-time employees
Unum will not subtract from your gross disability payment income you receive from, but not limited to, the following:

- 401(k) plans
- profit sharing plans
- thrift plans
- tax sheltered annuities
- stock ownership plans
- non-qualified plans of deferred compensation
- pension plans for partners
- military pension and disability income plans
- credit disability insurance
- franchise disability income plans
- a retirement plan from another Employer
- individual retirement accounts (IRA)
- individual disability income plans
- no fault motor vehicle plans
- salary continuation or accumulated sick leave plans, except disability income payments you receive under a group plan sponsored by your Employer

## WHAT IF SUBTRACTING DEDUCTIBLE SOURCES OF INCOME RESULTS IN A ZERO BENEFIT? (Minimum Benefit)

All full-time and part-time employees
The minimum monthly payment is the greater of:

- $100; or
- 10% of your gross disability payment.

Unum may apply this amount toward an outstanding overpayment.

## WHAT IF UNUM DETERMINES YOU MAY QUALIFY FOR DEDUCTIBLE INCOME BENEFITS?

All full-time and part-time employees
When we determine that you may qualify for benefits under Item(s) 1 and 2 in the deductible sources of income section, we will estimate your entitlement to these benefits and your Long Term Disability payment will be reduced by these estimated amounts if such benefits:

LTD-BEN-6  (12/1/2021)

- have not been awarded; and
- have not been denied; or
- have been denied and the denial is being appealed.

Your Long Term Disability payment will NOT be reduced by the estimated amount if you:

- apply for the disability payments under Item(s) 1 and 2 in the deductible sources of income section, and if denied, appeal to all administrative levels Unum feels are necessary;
- provide documentation of your application and/or appeal; and
- sign Unum's payment option form.  This form states that you promise to pay us any overpayment caused by an award.

If your payment has been reduced by an estimated amount, your payment will be adjusted when we receive proof:

- of the amount awarded; or
- that benefits have been denied and all appeals Unum feels are necessary have been completed.  In this case, a lump sum refund of the estimated amount will be made to you.

If you receive a lump sum payment from any deductible sources of income, the lump sum will be pro-rated on a monthly basis over the time period for which the sum was given.  If no time period is stated, we will use a reasonable one.

HOW LONG WILL UNUM CONTINUE TO SEND YOU PAYMENTS?

Unum will send you a payment each month up to the maximum period of payment. Your maximum period of payment is based on your age at disability as follows:

All full-time and part-time employees
OPTION 1

| Age at Disability | Maximum Period of Payment |
| --- | --- |
| Less than Age 62 | To Social Security Normal Retirement Age |
| Age 62 | 60 months |
| Age 63 | 48 months |
| Age 64 | 42 months |
| Age 65 | 36 months |
| Age 66 | 30 months |
| Age 67 | 24 months |
| Age 68 | 18 months |
| Age 69 or older | 12 months |

| Year of Birth | Social Security Normal Retirement Age |
| --- | --- |
| 1937 or before | 65 years |
| 1938 | 65 years 2 months |
| 1939 | 65 years 4 months |
| 1940 | 65 years 6 months |
| 1941 | 65 years 8 months |
| 1942 | 65 years 10 months |

LTD-BEN-7  (12/1/2021)

| | |
|---|---|
| 1943-1954 | 66 years |
| 1955 | 66 years 2 months |
| 1956 | 66 years 4 months |
| 1957 | 66 years 6 months |
| 1958 | 66 years 8 months |
| 1959 | 66 years 10 months |
| 1960 and after | 67 years |

OPTIONS 2 AND 3

| Age at Disability | Maximum Period of Payment |
|---|---|
| Less than age 65 | 5 years |
| Age 65 through 68 | To age 70, but not less than 1 year |
| Age 69 and over | 1 year |

OPTION 4

No Coverage

All employees who selected the 25% option prior to 12/1/17 (closed group)

| Age at Disability | Maximum Period of Payment |
|---|---|
| Less than Age 62 | To Social Security Normal Retirement Age |
| Age 62 | 60 months |
| Age 63 | 48 months |
| Age 64 | 42 months |
| Age 65 | 36 months |
| Age 66 | 30 months |
| Age 67 | 24 months |
| Age 68 | 18 months |
| Age 69 or older | 12 months |

| Year of Birth | Social Security Normal Retirement Age |
|---|---|
| 1937 or before | 65 years |
| 1938 | 65 years 2 months |
| 1939 | 65 years 4 months |
| 1940 | 65 years 6 months |
| 1941 | 65 years 8 months |
| 1942 | 65 years 10 months |
| 1943-1954 | 66 years |
| 1955 | 66 years 2 months |
| 1956 | 66 years 4 months |
| 1957 | 66 years 6 months |
| 1958 | 66 years 8 months |
| 1959 | 66 years 10 months |
| 1960 and after | 67 years |

LTD-BEN-8  (12/1/2021)

## WHEN WILL PAYMENTS STOP?

We will stop sending you payments and your claim will end on the earliest of the following:

- during the first 24 months of payments, when you are able to work in your regular occupation on a part-time basis and you do not;
- after 24 months of payments, when you are able to work in any gainful occupation on a part-time basis and you do not;
- if you are working and your monthly disability earnings exceed 80% of your indexed monthly earnings, the date your earnings exceed 80%;
- the end of the maximum period of payment;
- the date you are no longer disabled under the terms of the plan, unless you are eligible to receive benefits under Unum's Rehabilitation and Return to Work Assistance program;
- the date you fail to submit proof of continuing disability;
- after 12 months of payments if you are considered to reside outside the United States or Canada. You will be considered to reside outside these countries when you have been outside the United States or Canada for a total period of 6 months or more during any 12 consecutive months of benefits;
- the date you die.

## WHAT DISABILITIES HAVE A LIMITED PAY PERIOD UNDER YOUR PLAN?

The lifetime cumulative maximum benefit period for all disabilities due to mental illness and disabilities based primarily on self-reported symptoms is 24 months. Only 24 months of benefits will be paid for any combination of such disabilities even if the disabilities:

- are not continuous; and/or
- are not related.

However, Unum will send you payments beyond the 24 month period if you meet one of these conditions:

1. If you are confined to a hospital or institution at the end of the 24 month period, Unum will continue to send you payments during your confinement.

   If you are still disabled when you are discharged, Unum will send you payments for a recovery period of up to 90 days.

   If you become reconfined at any time during the recovery period and remain confined for at least 14 days in a row, Unum will send payments during that additional confinement and for one additional recovery period up to 90 more days.

2. If you are not confined to a hospital or institution but become confined for a period of at least 14 days within 90 days after the 24 month period for which you have received payments, Unum will send payments during the length of the confinement.

Under no circumstances will Unum pay beyond the maximum period of payment as indicated in the BENEFITS AT A GLANCE section of your policy.

LTD-BEN-9 (12/1/2021)

Unum will not apply the mental illness limitation to dementia if it is a result of:

- stroke;
- trauma;
- viral infection;
- Alzheimer's disease; or
- other conditions not listed which are not usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment.

## WHAT DISABILITIES ARE NOT COVERED UNDER YOUR PLAN?

Your plan does not cover any disabilities caused by, contributed to by, or resulting from your:

- intentionally self-inflicted injuries.
- active participation in a riot.
- loss of a professional license, occupational license or certification.
- commission of a crime for which you have been convicted.
- pre-existing condition.

Your plan will not cover a disability due to war, declared or undeclared, or any act of war.

Unum will not pay a benefit for any period of disability during which you are incarcerated.

## WHAT IS A PRE-EXISTING CONDITION?

You have a pre-existing condition if:

- you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the 3 months just prior to your effective date of coverage; and
- the disability begins in the first 12 months after your effective date of coverage.

## ARE YOU SUBJECT TO A PRE-EXISTING CONDITION IF YOU ENROLL FOR COVERAGE DURING AN OPEN ENROLLMENT PERIOD?

All full-time and part-time employees
The following applies if you become insured during the open enrollment period beginning on August 16, 2021 and ending on October 15, 2021:

You have a pre-existing condition if:

- you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the 3 months just prior to your effective date of coverage; and
- the disability begins in the first 12 months after your effective date of coverage.

LTD-BEN-10 (12/1/2021)

## WHAT HAPPENS IF YOU RETURN TO WORK FULL TIME WITH THE POLICYHOLDER AND YOUR DISABILITY OCCURS AGAIN?

If you have a recurrent disability, Unum will treat your disability as part of your prior claim and you will not have to complete another elimination period if:

- you were continuously insured under the plan for the period between the end of your prior claim and your recurrent disability; and
- your recurrent disability occurs within 6 months from the end of your prior claim.

Your recurrent disability will be subject to the same terms of the plan as your prior claim and will be treated as a continuation of that disability.

Any disability which occurs after 6 months from the date your prior claim ended will be treated as a new claim.  The new claim will be subject to all of the policy provisions, including the elimination period.

If you become entitled to payments under any other group long term disability plan, you will not be eligible for payments under the Unum plan.

**LTD-BEN-11  (12/1/2021)**

# LONG TERM DISABILITY

## OTHER BENEFIT FEATURES

**WHAT BENEFITS WILL BE PROVIDED TO YOU OR YOUR FAMILY IF YOU DIE OR ARE TERMINALLY ILL? (Survivor Benefit)**

**All full-time and part-time employees**
When Unum receives proof that you have died, we will pay your eligible survivor a lump sum benefit equal to 3 months of your gross disability payment if, on the date of your death:

- your disability had continued for 180 or more consecutive days; and
- you were receiving or were entitled to receive payments under the plan.

If you have no eligible survivors, payment will be made to your estate, unless there is none. In this case, no payment will be made.

However, we will first apply the survivor benefit to any overpayment which may exist on your claim.

You may receive your survivor benefit prior to your death if you have been diagnosed as terminally ill.

We will pay you a lump sum amount equal to of your gross disability payment if:

- you have been diagnosed with a terminal illness or condition;
- your life expectancy has been reduced to less than 12 months; and
- you are receiving monthly payments.

Your right to exercise this option and receive payment is subject to the following:

- you must make this election in writing to Unum; and
- your physician must certify in writing that you have a terminal illness or condition and your life expectancy has been reduced to less than 12 months.

This benefit is available to you on a voluntary basis and will only be payable once.

If you elect to receive this benefit prior to your death, no survivor benefit will be payable upon your death.

**All employees who selected the 25% option prior to 12/1/17 (closed group)**
When Unum receives proof that you have died, we will pay your eligible survivor a lump sum benefit equal to 3 months of your gross disability payment if, on the date of your death:

- your disability had continued for 180 or more consecutive days; and
- you were receiving or were entitled to receive payments under the plan.

If you have no eligible survivors, payment will be made to your estate, unless there is none. In this case, no payment will be made.

However, we will first apply the survivor benefit to any overpayment which may exist on your claim.

LTD-OTR-1  (12/1/2021)

You may receive your 3 month survivor benefit prior to your death if you have been diagnosed as terminally ill.

We will pay you a lump sum amount equal to 3 months of your gross disability payment if:

- you have been diagnosed with a terminal illness or condition;
- your life expectancy has been reduced to less than 12 months; and
- you are receiving monthly payments.

Your right to exercise this option and receive payment is subject to the following:

- you must make this election in writing to Unum; and
- your physician must certify in writing that you have a terminal illness or condition and your life expectancy has been reduced to less than 12 months.

This benefit is available to you on a voluntary basis and will only be payable once.

If you elect to receive this benefit prior to your death, no 3 month survivor benefit will be payable upon your death.

HOW CAN UNUM'S REHABILITATION AND RETURN TO WORK ASSISTANCE PROGRAM HELP YOU RETURN TO WORK?

Unum has a vocational Rehabilitation and Return to Work Assistance program available to assist you in returning to work. We will determine whether you are eligible for this program. In order to be eligible for rehabilitation services and benefits, you must be medically able to engage in a return to work program.

Your claim file will be reviewed by one of Unum's rehabilitation professionals to determine if a rehabilitation program might help you return to gainful employment. As your file is reviewed, medical and vocational information will be analyzed to determine an appropriate return to work program.

We will make the final determination of your eligibility for participation in the program.

We will provide you with a written Rehabilitation and Return to Work Assistance plan developed specifically for you.

The rehabilitation program may include, but is not limited to, the following services and benefits:

- coordination with your Employer to assist you to return to work;
- adaptive equipment or job accommodations to allow you to work;
- vocational evaluation to determine how your disability may impact your employment options;
- job placement services;
- resume preparation;
- job seeking skills training; or
- education and retraining expenses for a new occupation.

**LTD-OTR-2 (12/1/2021)**

**WHAT ADDITIONAL BENEFITS WILL UNUM PAY WHILE YOU PARTICIPATE IN A REHABILITATION AND RETURN TO WORK ASSISTANCE PROGRAM?**

**All full-time and part-time employees**
We will pay an additional benefit of 10% of your gross disability payment to a maximum benefit of $1,000 per month.

This benefit is not subject to policy provisions which would otherwise increase or reduce the benefit amount such as Deductible Sources of Income. However, the Total Benefit Cap will apply.

In addition, we will make monthly payments to you for 3 months following the date your disability ends if we determine you are no longer disabled while:

- you are participating in the Rehabilitation and Return to Work Assistance program; and
- you are not able to find employment.

This benefit payment may be paid in a lump sum.

**All employees who selected the 25% option prior to 12/1/17 (closed group)**
We will pay an additional benefit of 10% of your gross disability payment to a maximum benefit of $1,000 per month.

This benefit is not subject to policy provisions which would otherwise increase or reduce the benefit amount. However, the Total Benefit Cap will apply.

In addition, we will make monthly payments to you for 3 months following the date your disability ends if we determine you are no longer disabled while:

- you are participating in the Rehabilitation and Return to Work Assistance program; and
- you are not able to find employment.

This benefit payment may be paid in a lump sum.

**WHEN WILL REHABILITATION AND RETURN TO WORK ASSISTANCE BENEFITS END?**

Benefits for the Rehabilitation and Return to Work Assistance program will end on the earliest of the following dates:

- the date Unum determines that you are no longer eligible to participate in Unum's Rehabilitation and Return to Work Assistance program; or
- any other date on which monthly payments would stop in accordance with this plan.

**WHAT ADDITIONAL BENEFIT IS AVAILABLE FOR DEPENDENT CARE EXPENSES TO ENABLE YOU TO PARTICIPATE IN UNUM'S REHABILITATION AND RETURN TO WORK ASSISTANCE PROGRAM?**

While you are participating in Unum's Rehabilitation and Return to Work Assistance program, we will pay a Dependent Care Expense Benefit when you are disabled and you:

LTD-OTR-3  (12/1/2021)

1. are incurring expenses to provide care for a child under the age of 15; and/or
2. start incurring expenses to provide care for a child age 15 or older or a family member who needs personal care assistance.

The payment of the Dependent Care Expense Benefit will begin immediately after you start Unum's Rehabilitation and Return to Work Assistance program.

Our payment of the Dependent Care Expense Benefit will:

1. be $350 per month, per dependent; and
2. not exceed $1,000 per month for all dependent care expenses combined.

To receive this benefit, you must provide satisfactory proof that you are incurring expenses that entitle you to the Dependent Care Expense Benefit.

Dependent Care Expense Benefits will end on the earlier of the following:

1. the date you are no longer incurring expenses for your dependent;
2. the date you no longer participate in Unum's Rehabilitation and Return to Work Assistance program; or
3. any other date payments would stop in accordance with this plan.

**LTD-OTR-4  (12/1/2021)**

## STATE REQUIREMENTS

### NOTICE:

Policyholders/Insured have the right to file a complaint with the Arkansas Insurance Department (AID). You may call AID to request a complaint form at (800) 852-5494 or (501) 371-2640 or write the Department at:

**Arkansas Insurance Department**
**1 Commerce Way, Suite 102**
**Little Rock, Arkansas 72202**

**To file a complaint through your insurance company:**

**Call: Customer Relations**
**Toll-Free: 800-321-3889; Option 2**
**Email: custrel@unum.com**
**Mail: 2211 Congress Street**
**Portland, Maine 04122**

**STATE REQ-1  (12/1/2021)**

Claimant Name: Tanya Parker        Claim#: 21070146    Parker_Claim File 136

# OTHER SERVICES

These services are also available from us as part of your Unum Long Term Disability plan.

## IS THERE A WORK LIFE ASSISTANCE PROGRAM AVAILABLE WITH THE PLAN?

We do provide you and your dependents access to a work life assistance program designed to assist you with problems of daily living.

You can call and request assistance for virtually any personal or professional issue, from helping find a day care or transportation for an elderly parent, to researching possible colleges for a child, to helping to deal with the stress of the workplace. This work life program is available for everyday issues as well as crisis support.

This service is also available to your Employer.

This program can be accessed by a 1-800 telephone number available 24 hours a day, 7 days a week or online through a website.

Information about this program can be obtained through your plan administrator.

## HOW CAN UNUM HELP YOUR EMPLOYER IDENTIFY AND PROVIDE WORKSITE MODIFICATION?

A worksite modification might be what is needed to allow you to perform the material and substantial duties of your regular occupation with your Employer. One of our designated professionals will assist you and your Employer to identify a modification we agree is likely to help you remain at work or return to work. This agreement will be in writing and must be signed by you, your Employer and Unum.

When this occurs, Unum will reimburse your Employer or the vendor providing the worksite modification services, for the cost of the modification, up to the greater of:

- $1,000; or
- the equivalent of 2 months of your monthly benefit.

This benefit is available to you on a one time only basis.

## HOW CAN UNUM'S SOCIAL SECURITY CLAIMANT ADVOCACY PROGRAM ASSIST YOU WITH OBTAINING SOCIAL SECURITY DISABILITY BENEFITS?

In order to be eligible for assistance from Unum's Social Security claimant advocacy program, you must be receiving monthly payments from us. Unum can provide expert advice regarding your claim and assist you with your application or appeal.

Receiving Social Security benefits may enable:

- you to receive Medicare after 24 months of disability payments;
- you to protect your retirement benefits; and
- your family to be eligible for Social Security benefits.

We can assist you in obtaining Social Security disability benefits by:

SERVICES-1 (12/1/2021)

- helping you find appropriate legal representation;
- obtaining medical and vocational evidence; and
- reimbursing pre–approved case management expenses.

**SERVICES-2  (12/1/2021)**

# GLOSSARY

**ACTIVE EMPLOYMENT** means you are working for your Employer for earnings that are paid regularly and that you are performing the material and substantial duties of your regular occupation. You must be regularly scheduled to work on average at least the minimum number of hours as described under the minimum hours requirement in each plan.

Your work site must be:

- your Employer's usual place of business;
- an alternative work site at the direction of your Employer, including your home; or
- a location to which your job requires you to travel.

Normal vacation is considered active employment.
Temporary and seasonal workers are excluded from coverage.

All full-time and part-time employees
**DEDUCTIBLE SOURCES OF INCOME** means income from deductible sources listed in the plan which you receive or are entitled to receive while you are disabled. This income will be subtracted from your gross disability payment.

**DEPENDENT** means:

- your child(ren) under the age of 15; and
- your child(ren) age 15 or over or a family member who requires personal care assistance.

**DISABILITY EARNINGS** means the earnings which you receive while you are disabled and working, plus the earnings you could receive if you were working to your maximum capacity.

**ELIMINATION PERIOD** means a period of continuous disability which must be satisfied before you are eligible to receive benefits from Unum.

**EMPLOYEE** means a person who is in active employment in the United States with the Employer.

**EMPLOYER** means the Policyholder, and includes any division, subsidiary or affiliated company named in the policy.

**EMPLOYER'S CONTRIBUTION** in the context of a retirement plan that is part of any federal, state, county, municipal or association retirement system means any contribution made by your Employer and any contribution made on your behalf which has been picked up by your Employer under Internal Revenue Code Section 414(h)(2) so that it does not constitute taxable income to you.

**EVIDENCE OF INSURABILITY** means a statement of your medical history which Unum will use to determine if you are approved for coverage. Evidence of insurability will be at Unum's expense.

**GLOSSARY-1 (12/1/2021)**

GAINFUL OCCUPATION means an occupation that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds:

80% of your indexed monthly earnings, if you are working; or
60% of your indexed monthly earnings, if you are not working.

GOVERNMENTAL RETIREMENT SYSTEM means a plan which is part of any federal, state, county, municipal or association retirement system, including but not limited to, a state teachers retirement system, public employees retirement system or other similar retirement system for state or local government employees providing for the payment of retirement and/or disability benefits to individuals.

GRACE PERIOD means the period of time following the premium due date during which premium payment may be made.

All full-time and part-time employees
GROSS DISABILITY PAYMENT means the benefit amount before Unum subtracts deductible sources of income and disability earnings.

All employees who selected the 25% option prior to 12/1/17 (closed group)
GROSS DISABILITY PAYMENT means the benefit amount before Unum subtracts disability earnings.

HOSPITAL OR INSTITUTION means an accredited facility licensed to provide care and treatment for the condition causing your disability.

INDEXED MONTHLY EARNINGS means your monthly earnings adjusted on each anniversary of benefit payments by the lesser of 10% or the current annual percentage increase in the Consumer Price Index. Your indexed monthly earnings may increase or remain the same, but will never decrease.

The Consumer Price Index (CPI-U) is published by the U.S. Department of Labor. Unum reserves the right to use some other similar measurement if the Department of Labor changes or stops publishing the CPI-U.

Indexing is only used as a factor in the determination of the percentage of lost earnings while you are disabled and working and in the determination of gainful occupation.

INJURY means a bodily injury that is the direct result of an accident and not related to any other cause. Disability must begin while you are covered under the plan.

INSURED means any person covered under a plan.

All full-time and part-time employees
LAW, PLAN OR ACT means the original enactments of the law, plan or act and all amendments.

LAYOFF or LEAVE OF ABSENCE means you are temporarily absent from active employment for a period of time that has been agreed to in advance in writing by your Employer.

Your normal vacation time or any period of disability is not considered a temporary layoff or leave of absence.

GLOSSARY-2 (12/1/2021)

LIMITED means what you cannot or are unable to do.

MATERIAL AND SUBSTANTIAL DUTIES means duties that:

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified.

MAXIMUM CAPACITY means, based on your restrictions and limitations:

- during the first 24 months of disability, the greatest extent of work you are able to do in your regular occupation, that is reasonably available.
- beyond 24 months of disability, the greatest extent of work you are able to do in any occupation, that is reasonably available, for which you are reasonably fitted by education, training or experience.

MAXIMUM PERIOD OF PAYMENT means the longest period of time Unum will make payments to you for any one period of disability.

MENTAL ILLNESS means a psychiatric or psychological condition classified in the Diagnostic and Statistical Manual of Mental Health Disorders (DSM), published by the American Psychiatric Association, most current as of the start of a disability.  Such disorders include, but are not limited to, psychotic, emotional or behavioral disorders, or disorders relatable to stress.  If the DSM is discontinued or replaced, these disorders will be those classified in the diagnostic manual then used by the American Psychiatric Association as of the start of a disability.

MONTHLY BENEFIT means the total benefit amount for which an employee is insured under this plan subject to the maximum benefit.

MONTHLY EARNINGS means your gross monthly income from your Employer as defined in the plan.

All full-time and part-time employees
MONTHLY PAYMENT means your payment after any deductible sources of income have been subtracted from your gross disability payment.

PART-TIME BASIS means the ability to work and earn between 20% and 80% of your indexed monthly earnings.

PAYABLE CLAIM means a claim for which Unum is liable under the terms of the policy.

PHYSICIAN means:

- a person performing tasks that are within the limits of his or her medical license; and
- a person who is licensed to practice medicine and prescribe and administer drugs or to perform surgery; or
- a person with a doctoral degree in Psychology (Ph.D. or Psy.D.) whose primary practice is treating patients; or
- a person who is a legally qualified medical practitioner according to the laws and regulations of the governing jurisdiction.

Unum will not recognize you, or your spouse, children, parents or siblings, a business or professional partner, or any person who has a financial affiliation or business interest with you, as a physician for a claim that you send to us.

GLOSSARY-3  (12/1/2021)

PLAN means a line of coverage under the policy.

POLICYHOLDER means the Employer to whom the policy is issued.

PRE-EXISTING CONDITION means a condition for which you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines for your condition during the given period of time as stated in the plan.

RECURRENT DISABILITY means a disability which is:

- caused by a worsening in your condition; and
- due to the same cause(s) as your prior disability which met the elimination period and for which Unum made a disability payment.

REGULAR CARE means:

- you personally visit a physician as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat your disabling condition(s); and
- you are receiving the most appropriate treatment and care which conforms with generally accepted medical standards, for your disabling condition(s) by a physician whose specialty or experience is the most appropriate for your disabling condition(s), according to generally accepted medical standards.

REGULAR OCCUPATION means the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

RETIREMENT PLAN means a defined contribution plan or defined benefit plan. These are plans which provide retirement benefits to employees and are not funded entirely by employee contributions. Retirement Plan does not include any plan which is part of any governmental retirement system.

All full-time and part-time employees
SALARY CONTINUATION OR ACCUMULATED SICK LEAVE means continued payments to you by your Employer of all or part of your monthly earnings, after you become disabled as defined by the Policy. This continued payment must be part of an established plan maintained by your Employer for the benefit of all employees covered under the Policy. Salary continuation or accumulated sick leave does not include compensation paid to you by your Employer for work you actually perform after your disability begins. Such compensation is considered disability earnings, and would be taken into account in calculating your monthly payment.

SELF-REPORTED SYMPTOMS means the manifestations of your condition which you tell your physician, that are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headaches, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy.

SICKNESS means an illness or disease. Disability must begin while you are covered under the plan.

GLOSSARY-4  (12/1/2021)

**SURVIVOR, ELIGIBLE** means your spouse, if living; otherwise your children under age 25 equally.

**TOTAL BENEFIT CAP** means the total benefit payable to you on a monthly basis (including all benefits provided under this plan) will not exceed 100% of your monthly earnings. However, if you are participating in Unum's Rehabilitation and Return to Work Assistance program, the total benefit payable to you on a monthly basis (including all benefits provided under this plan) will not exceed 110% of your monthly earnings.

**TOTAL COVERED PAYROLL** means the total amount of monthly earnings for which employees are insured under this plan.

**WAITING PERIOD** means the continuous period of time (shown in each plan) that you must be in active employment in an eligible group before you are eligible for coverage under a plan.

**WE, US and OUR** means Unum Life Insurance Company of America.

**YOU** means an employee who is eligible for Unum coverage.

**GLOSSARY-5  (12/1/2021)**

**Additional Claim and Appeal Information**
**Relative to policy issued by Unum Life Insurance Company of America ("Unum")**

## APPLICABILITY OF ERISA

If the policy provides benefits under a Plan which is subject to the Employee Retirement Income Security Act of 1974 (ERISA), the following provisions apply. Whether a Plan is governed by ERISA is determined by a court, however, your Employer may have information related to ERISA applicability. If ERISA applies, the following items constitute the Plan: the additional information contained in this document, the policy, including your certificate of coverage, and any additional summary plan description information provided by the Plan Administrator. Benefit determinations are controlled exclusively by the policy, your certificate of coverage, and the information in this document.

## HOW TO FILE A CLAIM

If you wish to file a claim for benefits, you should follow the claim procedures described in your insurance certificate. To complete your claim filing, Unum must receive the claim information it requests from you (or your authorized representative), your attending physician and your Employer. If you or your authorized representative has any questions about what to do, you or your authorized representative should contact Unum directly.

## CLAIMS PROCEDURES

Unum will give you notice of the decision no later than 45 days after the claim is filed. This time period may be extended twice by 30 days if Unum both determines that such an extension is necessary due to matters beyond the control of the Plan and notifies you of the circumstances requiring the extension of time and the date by which Unum expects to render a decision. If such an extension is necessary due to your failure to submit the information necessary to decide the claim, the notice of extension will specifically describe the required information, and you will be afforded at least 45 days within which to provide the specified information. If you deliver the requested information within the time specified, any 30 day extension period will begin after you have provided that information. If you fail to deliver the requested information within the time specified, Unum may decide your claim without that information.

If your claim for benefits is wholly or partially denied, the notice of adverse benefit determination under the Plan will:

- state the specific reason(s) for the determination;

- reference specific Plan provision(s) on which the determination is based;

- describe additional material or information necessary to complete the claim and why such information is necessary;

- describe Plan procedures and time limits for appealing the determination, and your right to obtain information about those procedures and the right to bring a lawsuit under Section 502(a) of ERISA following an adverse determination from Unum on appeal; and

ADDLINFO-1 (12/1/2021)

- disclose any internal rule, guidelines, protocol or similar criterion relied on in making the adverse determination (or state that such information will be provided free of charge upon request).

Notice of the determination may be provided in written or electronic form. Electronic notices will be provided in a form that complies with any applicable legal requirements.

## APPEAL PROCEDURES

You have 180 days from the receipt of notice of an adverse benefit determination to file an appeal. Requests for appeals should be sent to the address specified in the claim denial. A decision on review will be made not later than 45 days following receipt of the written request for review. If Unum determines that special circumstances require an extension of time for a decision on review, the review period may be extended by an additional 45 days (90 days in total). Unum will notify you in writing if an additional 45 day extension is needed.

If an extension is necessary due to your failure to submit the information necessary to decide the appeal, the notice of extension will specifically describe the required information, and you will be afforded at least 45 days to provide the specified information. If you deliver the requested information within the time specified, the 45 day extension of the appeal period will begin after you have provided that information. If you fail to deliver the requested information within the time specified, Unum may decide your appeal without that information.

You will have the opportunity to submit written comments, documents, or other information in support of your appeal. You will have access to all relevant documents as defined by applicable U.S. Department of Labor regulations. The review of the adverse benefit determination will take into account all new information, whether or not presented or available at the initial determination. No deference will be afforded to the initial determination.

The review will be conducted by Unum and will be made by a person different from the person who made the initial determination and such person will not be the original decision maker's subordinate. In the case of a claim denied on the grounds of a medical judgment, Unum will consult with a health professional with appropriate training and experience. The health care professional who is consulted on appeal will not be the individual who was consulted during the initial determination or a subordinate. If the advice of a medical or vocational expert was obtained by the Plan in connection with the denial of your claim, Unum will provide you with the names of each such expert, regardless of whether the advice was relied upon.

A notice that your request on appeal is denied will contain the following information:

- the specific reason(s) for the determination;

- a reference to the specific Plan provision(s) on which the determination is based;

- a statement disclosing any internal rule, guidelines, protocol or similar criterion relied on in making the adverse determination (or a statement that such information will be provided free of charge upon request);

ADDLINFO-2 (12/1/2021)

- a statement describing your right to bring a lawsuit under Section 502(a) of ERISA if you disagree with the decision;

- the statement that you are entitled to receive upon request, and without charge, reasonable access to or copies of all documents, records or other information relevant to the determination; and

- the statement that "You or your Plan may have other voluntary alternative dispute resolution options, such as mediation.  One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State insurance regulatory agency".

Notice of the determination may be provided in written or electronic form.  Electronic notices will be provided in a form that complies with any applicable legal requirements.

Unless there are special circumstances, this administrative appeal process must be completed before you begin any legal action regarding your claim.

OTHER RIGHTS

Unum, for itself and as claims fiduciary for the Plan, is entitled to legal and equitable relief to enforce its right to recover any benefit overpayments caused by your receipt of disability earnings or deductible sources of income from a third party.  This right of recovery is enforceable even if the amount you receive from the third party is less than the actual loss suffered by you but will not exceed the benefits paid you under the policy.  Unum and the Plan have an equitable lien over such sources of income until any benefit overpayments have been recovered in full.

ADDLINFO-3 (12/1/2021)

**Addendum to the "Additional Summary Plan Description Information"
included with your certificate of coverage or policy
and effective for claims filed on or after April 1, 2018.**

The regulations governing ERISA disability claims and appeals have been amended.
The amended regulations apply to disability claims filed on or after April 1, 2018. To
the extent the Additional Summary Plan Description Information included with your
certificate of coverage or policy conflicts with these new requirements, these new
rights and procedures will apply.

These new rights and procedures include:

Any cancellation or discontinuance of your disability coverage that has a retroactive
effect will be treated as an adverse benefit determination, except in the case of
failure to timely pay required premiums or contributions toward the cost of coverage.

If you live in a county with a significant population of non-English speaking persons,
the plan will provide, in the non-English language(s), a statement of how to access
oral and written language services in those languages.

For any adverse benefit determination, you will be provided with an explanation of
the basis for disagreeing or not following the views of: (1) health care professionals
who have treated you or vocational professionals who have evaluated you; (2) the
advice of medical or vocational professionals obtained on behalf of the plan; and (3)
any disability determination made by the Social Security Administration regarding
you and presented to the plan by you.

For any adverse benefit determination, you will be given either the specific internal
rules, guidelines, protocols, standards or other similar criteria of the plan relied upon
in making that decision, or a statement that such rules, etc. do not exist.

Prior to a final decision being made on an appeal, you will have the opportunity to
review and respond to any new or additional rationale or evidence considered, relied
upon, or generated by the plan in connection with your claim.

If an adverse benefit determination is upheld on appeal, you will be given notice of
any applicable contractual limitations period that applies to your right to bring legal
proceedings and the calendar date on which that period expires.

Should the plan fail to establish or follow ERISA required disability claims
procedures, you may be entitled to pursue legal remedies under section 502(a) of
the Act without exhausting your administrative remedies, as more completely set
forth in section 503-1(l).

**ADDLINFO-4  (12/1/2021)**

# Privacy Notice

This Privacy Notice applies to Unum Group's United States insurance operations and is being provided on behalf of its affiliates listed below ("Unum" "we"), as required by the Gramm–Leach Bliley Act and state insurance laws. This Notice describes how we collect, share, and protect nonpublic personal information (NPI).

## COLLECTING INFORMATION

We collect NPI about our customers to provide them with insurance products and services, perform underwriting, provide stop loss coverage, and administer claims. The types of NPI we collect for these purposes may include telephone number, address, Social Security number, date of birth, occupation, income, and medical history, including treatment. We may receive NPI from your applications and forms, medical providers, other insurers, employers, insurance support organizations and service providers.

## SHARING INFORMATION

We share the types of NPI described above primarily with people who perform insurance, business and professional services for us, such as helping us perform underwriting, provide stop loss coverage, pay claims, detect fraud, and to provide reinsurance or auditing. We may share NPI with medical providers for insurance and treatment purposes and with insurance support organizations. The organizations may retain the NPI and disclose it to others for whom it performs services. In certain cases, we may share NPI with group policyholders for reporting and auditing purposes, with parties for a proposed or final sale of insurance business or for study purposes. We may also share NPI when otherwise required or permitted by law, such as sharing with governmental or other legal authorities. When legally necessary, we ask your permission before sharing NPI about you. Our practices apply to our former, current and future customers.

We do not share your health NPI to market any product or service. We also do not share any NPI to market non-financial products and services.

The law allows us to share NPI as described above (except health information) with affiliates to market financial products and services. The law does not allow you to restrict these disclosures. We may also share with companies that help us market our insurance products and services, such as vendors that provide mailing services to us. We may share with other financial institutions to jointly market financial products and services. When required by law, we ask your permission before we share NPI for marketing purposes.

When other companies help us conduct business, we expect them to follow applicable privacy laws. We do not authorize them to use or share NPI except when necessary to conduct the work they are performing for us or to meet regulatory or other governmental requirements.

Unum companies, including insurers and insurance service providers, may share NPI about you with each other. The NPI might not be directly related to our transaction or experience with you. It may include financial or other personal information such as employment history. Consistent with the Fair Credit Reporting Act, we ask your permission before sharing NPI that is not directly related to our transaction or experience with you.

## SAFEGUARDING INFORMATION

We have physical, electronic and procedural safeguards that protect the confidentiality and security of NPI. We give access only to employees who need to know the NPI to provide insurance products or services to you.

## ACCESS TO INFORMATION

You may request access to certain NPI we collect to provide you with insurance products and services. You must make your request in writing, providing your full name, address, telephone number and policy number, to the address below. We will reply within 30 business days of receipt. If you request, we will send copies of the NPI to you or make available to you at our office. If the NPI includes health information, we may provide the health information to you

GLB-1  (12/1/2021)

Claimant Name: Tanya  Parker       Claim #: 21070146       Parker_Claim File 148

through a health care provider you designate. We will also send you information related to disclosures. We may charge a reasonable fee to cover our copying costs.

This section applies to NPI we collect to provide you with coverage. It does not apply to NPI we collect in anticipation of a claim or civil or criminal proceeding.

CORRECTION OF INFORMATION
If you believe the NPI we have about you is incorrect, please write to us and include your full name, address, telephone number and policy number if we have issued a policy, and the reason you believe the NPI is inaccurate. We will reply within 30 business days of receipt. If we agree with you, we will correct the NPI and notify you and insurance support organizations that may have received NPI from us in the preceding 7 years. We will also, if you ask, notify any person who may have received the incorrect NPI from us in the past 2 years.

If we disagree with you, we will tell you we are not going to make the correction and the reason(s) for our refusal. We will also tell you that you may submit a statement to us. Your statement should include the NPI you believe is correct and the reason(s) why you disagree with our decision not to correct the NPI in our files. We will file your statement with the disputed NPI to be accessible. We will include your statement any time the disputed NPI is reviewed or disclosed. We will also give the statement to insurance support organizations that gave us NPI and to any person designated by you, if we disclosed the disputed NPI to that person in the past two years.

COVERAGE DECISIONS
If we decide not to issue coverage to you, we will provide you with the specific reason(s) for our decision. We will also tell you how to access and correct certain NPI. You may submit a written request for the reason(s) for our decision within 90 business days of our decision. We will reply within 21 business days of receipt with the specific reasons, if not initially furnished, and specific items of information that supported our decision.

CONTACTING US
For additional information about Unum's commitment to privacy and to view a copy of our HIPAA Privacy Notice, please visit: unum.com/privacy or colonialife.com. You may also write to: Privacy Officer, Unum, 2211 Congress Street, B267, Portland, Maine 04122 or at Privacy@unum.com.

We reserve the right to modify this notice. We will provide you with a new notice if we make material changes to our privacy practices.

Unum is providing this notice to you on behalf of the following insuring companies: Unum Life Insurance Company of America, Unum Insurance Company, First Unum Life Insurance Company, Provident Life and Accident Insurance Company, Provident Life and Casualty Insurance Company, Colonial Life & Accident Insurance Company, The Paul Revere Life Insurance Company and Starmount Life Insurance Company.

2020 Unum Group. All rights reserved. Unum is a registered trademark and marketing brand of Unum Group and its insuring subsidiaries.

unum.com        MK-1883 (06-2020)

GLB-2  (12/1/2021)

## LIMITATIONS AND EXCLUSIONS UNDER THE
## ARKANSAS LIFE AND HEALTH INSURANCE
## GUARANTY ASSOCIATION ACT

Residents of this state who purchase life insurance, annuities or health and accident insurance should know that the insurance companies licensed in this state to write these types of insurance are members of the Arkansas Life and Health Insurance Guaranty Association ("Guaranty Association"). The purpose of the Guaranty Association is to assure that policy and contract owners will be protected, within certain limits, in the unlikely event that a member insurer becomes financially unable to meet its obligations. If this should happen, the Guaranty Association will assess its other member insurance companies for the money to pay the claims of policy owners who live in this state and, in some cases, to keep coverage in force. The valuable extra protection provided by the member insurers through the Guaranty Association is not unlimited, however. And, as noted in bold below, this protection is not a substitute for consumers' care in selecting insurance companies that are well managed and financially stable.

### DISCLAIMER

The Arkansas Life and Health Insurance Guaranty Association ("Guaranty Association") may not provide coverage for this policy, if coverage is provided, it may be subject to substantial limitations or exclusions and require continued residency in this state. You should not rely on coverage by the Guaranty Association in purchasing an insurance policy or contract.

Coverage is NOT provided for your policy or contract or any portion of it that is not guaranteed by the insurer or for which you have assumed the risk, such as non-guaranteed amounts held in a separate account under a variable life or variable annuity contract.

Insurance companies or their agents are required by law to provide you with this notice. However, insurance companies and their agents are prohibited by law from using the existence of the Guaranty Association to induce you to purchase any kind of insurance policy.

The Arkansas Life and Health Insurance Guaranty Association
c/o The Liquidation Division
1023 West Capitol
Little Rock, Arkansas 72201

Arkansas Insurance Department
1 Commerce Way, Suite 102
Little Rock, Arkansas 72202

The state law that provides for this safety-net is called the Arkansas Life and Health Insurance Guaranty Association Act ("Act"). On the back of this page is a brief summary of the Act's coverages, exclusions and limits. This summary does not cover

GUAR-1 (12/1/2021)

all provisions of the Act; nor does it in any way change anyone's rights or obligations under the Act or the rights or obligations of the Guaranty Association.

## COVERAGE

Generally, individuals will be protected by the Guaranty Association if they live in this state and hold a life, annuity or health insurance contract or policy, or if they are insured under a group insurance contract issued by a member insurer. The beneficiaries, payees or assignees of policy or contract owners are protected as well, even if they live in another state.

## EXCLUSIONS FROM COVERAGE

However, persons owning such policies are NOT protected by the Guaranty Association if:

- They are eligible for protection under the laws of another state (this may occur when the insolvent insurer was incorporated in another state whose guaranty association protects insureds who live outside that state);
- The insurer was not authorized to do business in this state;
- Their policy or contract was issued by a nonprofit hospital or medical service organization, an HMO, a fraternal benefit society, a mandatory state pooling plan, a mutual assessment company or similar plan in which the policy or contract owner is subject to future assessments, or by an insurance exchange.

The Guaranty Association also does NOT provide coverage for:

- Any policy or contract or portion thereof which is not guaranteed by the insurer or for which the owner has assumed the risk, such as non-guaranteed amounts held in a separate account under a variable life or variable annuity contract;
- Any policy of reinsurance (unless an assumption certificate was issued);
- Interest rate yields that exceed an average rate;
- Dividends and voting rights and experience rating credits;
- Credits given in connection with the administration of a policy by a group contract holder;
- Employers' plans to the extent they are self-funded (that is, not insured by an insurance company, even if an insurance company administers them);
- Unallocated annuity contracts (which give rights to group contract holders, not individuals);
- Unallocated annuity contracts issued to/in connection with benefit plans protected under Federal Pension Benefit Corporation ("FPBC") (whether the FPBC is yet liable or not);
- Portions of an unallocated annuity contract not owned by a benefit plan or a government lottery (unless the owner is a resident) or issued to a collective investment trust or similar pooled fund offered by a bank or other financial institution);
- Portions of a policy or contract to the extent assessments required by law for the Guaranty Association are preempted by State or Federal law;
- Obligations that do not arise under the policy or contract, including claims based on marketing materials or side letters, riders, or other documents which do not meet filing requirements, or claims for policy misrepresentations, or extra-contractual or penalty claims;

GUAR-2 (12/1/2021)

– Contractual agreements establishing the member insurer's obligations to provide book value accounting guarantees for defined contribution benefit plan participants (by reference to a portfolio of assets owned by a nonaffiliate benefit plan or its trustees).

## LIMITS ON AMOUNT OF COVERAGE

The Act also limits the amount the Guaranty Association is obligated to cover: The Guaranty Association cannot pay more than what the insurance company would owe under a policy or contract. Also, for any one insured life, the Guaranty Association will pay a maximum of $300,000 in life and annuity benefits and $500,000 in health insurance benefits — no matter how many policies and contracts there were with the same company, even if they provided different types of coverages. Within these overall limits, the Association will not pay more than $300,000 in disability and long term care benefits, $500,000 in health insurance benefits, $300,000 in present value of annuity benefits, or $300,000 in life insurance death benefits or net cash surrender values— again, no matter how many policies and contracts there were with the same company, and no matter how many different types of coverages. There is a $1,000,000 limit with respect to any contract holder for unallocated annuity benefits, irrespective of the number of contracts held by the contract holder. These are limitations for which the Guaranty Association is obligated before taking into account either its subrogation and assignment rights or the extent to which those benefits could be provided out of the assets of the impaired or insolvent insurer.

GUAR-3  (12/1/2021)

Fax to 18004472498 (FISTD800) at 03/28/2022 13:11:43 from (5013586196) Req ID 2022032813324616292E.    Page 2 of 52 (C)

03/28/2022    12:13 CENTRAL ARKANSAS LUNG    (FAX)501 358 6196    P.002/052

# Attending Physician's Statement –
## Disability Continuation Claim
### To be furnished without expense to the Company

Any person who knowingly and with intent to injure, defraud, or deceive any insurance company files a statement of claim containing any false, incomplete or misleading information is guilty of a felony of the third degree.

| | |
|---|---|
| Patient's name **Tanya Parker** | Patient's Date of Birth  **03 / 13 / 1970** |

1. Nature of sickness or injury. (Describe complications, if any) If this is a pregnancy provide the date of delivery or estimated due date. **Post COVID complications**

2. Describe any other disease or infirmity affecting present condition.
**Shortness of breath, Post-viral fatigue syndrome, cough**

3. Give date of treatments.
(Since **10/20/2021, 11/24/2021,** )    Office: **Central AR lung**
**11/30/2021, 1/25/2022**    Home:
Hospital:

4. Is patient still under your care for this condition?  ☑ Yes    ☐ No

If discharged, give date:

5. How long was or will patient be continuously totally disabled (unable to work)?
From: **6/17/2021**    Through: **undetermined**

6. How long was or will patient be partially disabled?
From: **6/17/2021**    Through: **undetermined**

7. Was patient confined to the house?    Yes ☐    No ☑

(If "Yes", give dates)  From:    Through:

### PHYSICIAN'S REMARKS

**Follow-up on 5/25/2022**

FAILURE TO PROVIDE ALL INFORMATION BELOW MAY DELAY CLAIM PAYMENT

**03/08/2022**    _(signature)_    **M.D.**
Date    Signature of Attending Physician    M. D. (Degree)

**650 United Dr. 5r 200. Conway**    **AR**    **72032**
Street Address    City or Town    State    ZIP Code

**(501) 852-5500**
Telephone Number

Submit Completed Form to:
Claims Department
P.O. Box 924408
Houston, TX 77292-4408
Customer Service Department (800) 999-2971 or (713) 821-6586
www.manhattanlife.com

DCC 1213 (rev. 3.12.15)

**EXHIBIT**
tabbies
**3**

ManhattanLife.

Claimant Name: Tanya Parker    Claim #:

**Parker_Claim File 035**

From ReleasePoint 1.626.628.9628 Tue Apr 19 00:06:04 2022 MDT Page 2 of 4

Unum Life Insurance Company of America
Medical Information Intake
P.O. Box 1390                                     Claim #: 9185192 - 21070146
St. Peters, MO  63376

Please provide current restrictions and limitations with focus on your patient's function.

**Restrictions**          Begin Date 06/17/2021  End Date undetermined current/
(Describe what the patient should not do):

_Patient to avoid any activity/exertion that is intolerable. Prolonged periods of standing/walking/lifting/pushing/pulling._

**Limitations**          Begin Date 06/17/2021  End Date undetermined current/
(Describe what the patient cannot do):

_Patient to avoid any activity/exertion that is intolerable. Prolonged periods of standing/walking/lifting/pushing/pulling._

If you wish, you may respond directly on this letter.  Please sign and date in the space provided below and return this completed questionnaire with the requested items above.

Signature _____          Date _04/25/2022_

If you have any questions regarding this matter, please contact me.

Thank you,

Jerome Chares Ramos

Medical Records Specialist
Phone No.: (213) 349-9450
Fax No: (423) 933-2356

**EXHIBIT 4**

RPID: 9185192

                                    Activity
--------------------------------------------------------------------------------

Checked/Unchecked Indicator: No
Type: CVM         Name: Clinical Analysis
Status: Completed
Original Notify Date: 04/22/2022
Notify Date: 04/22/2022
Due Date:
Subject: CA
Upon Completion Notify: Claim Owner
Upon Completion Notify Linked Claim Owner(s): No
Mark As Priority: No
Activity Owner: Knight, Kathryn
Action: Refer to Forum with OSP

Request Fields
------------------------------------------------------------------------
Request: Winkler, Amanda 04/22/2022 12:29:32:

Question/purpose of this forum    Based on the available medical information, is
the insured precluded from performing the full time functional demands as outlined
by the VRC from 6/16/2021 through 12/12/2021 and beyond?  If yes, please outline
the expected duration.
Claim Overview    52 yo LPN oow due to shortness of breath, post-viral fatigue
syndrome and cough. EE reports treatment with family medicine, social worker,
pulmonology and cardiology. EE is receiving WC.
Contractual Considerations    2 yr residual 180 day EP
Offsets (currently receiving, could be eligible, i.e., SSDI, WC, Pension, etc.)
none reported (WC not an offset in policy)
Voc Identification of Own Occ and/or gainful options, RTW    LPN - JD on file
gainful - $14.39 term'd 12/7/21
Prior established duration/claim direction    Unclear if supported. EE with c/o SOB
however PFT and CT were unremarkable and pulmonology notes from pulmonology
standpoint EE is fine. She was found to have moderate asthma. EE was referred to
Dr. Gojer (cardiology) for further workup.  Recommend obtaining records and R/Ls
from cardiology Dr. Gojer.
Validate ICD    R69 U09.9
Outline the current restrictions and/or limitations
 Diagnosis/Syndrome/Condition: shortness of breath, post-COVID, cough
Physician/Provider(s) and Specialty: Dr. Ladly Abraham - pulmonology Date Last
Seen: 1/25        Next Office Visit: 5/14 R&Ls per Provider w/ Date Provided:
Per EE, this is the only provider asserting RLs - requested from AP, no response
Diagnosis/Syndrome/Condition: shortness of breath, cough
Physician/Provider(s) and Specialty: Dr. Gary Bowman - family practice Date Last
Seen: October        Next Office Visit: tbd R&Ls per Provider w/ Date Provided:
not asserting per EE    Diagnosis/Syndrome/Condition: rapid heartbeat, myocarditis
Physician/Provider(s) and Specialty: Dr. Bernard Gojer - cardio  Date Last Seen:
3/9/22        Next Office Visit: Sept  R&Ls per Provider w/ Date Provided: not
asserting per EE    Insert Additional Provider Information Here:
Date of recent TPC with EE; pertinent details    per 4/8 ILTPC - EE confirmed oow
d/t post-COVID-19 syndrome.  EE confirmed COVID-19 symptoms began on 6/16, she
tested positive on 6/16 and went to the ER at Baptist somewhere around 6/20. They
didn't really do anything and then she went back on 6/25 in respiratory distress.
She was in the hospital for 5 days.  Still has a lot of fatigue and trouble
breathing. Not on oxygen, she wasn't on oxygen when she was d/c from the hospital.
Still has chest pain and fluttering and things like that. When she had her last
flup w/ cardio they said it's probably myocarditis resulting from her COVID
infection. Tx plan is flups w/ her APs and some testing w/ her cardio. They did
some monitoring in Dec. He said it just showed signs of rapid heartbeat and stuff
which she takes medication for, that was the only thing showing on it. She won't
see him again until Sept, said it's just part of the myocarditis. She does have
moderate asthma so she's on an inhaler and talking about adding albuterol if it

EXHIBIT
5

gets worse. She does have a lot of headaches still too.  No other conditions.
Everything is related to her post-COVID syndrome.
BRI Findings (relevant findings)    n/a


Created By: Winkler, Amanda
Created Date: 04/22/2022 12:29:32          Create Site: Chattanooga

Response Fields
-----------------------------------------------------------------------
Response: Knight, Kathryn 04/26/2022 11:05:25: Claimant Name:  Tanya  Parker
NL Claim Number: 21070146


Medical Analysis Checklist:
Diagnosis/Syndrome/Condition:  dyspnea, asthma
     Physician/Provider and Specialty: Dr. Ladly Abraham, Pulmonology
     Date Last Seen: 1/25/22
     Next Office Visit: 5/14/22
Restrictions and Limitations per Physician/Provider with Date Provided: R/Ls
requested but no response from AP. Per EE this is the only provider asserting R/Ls.

Assessment: 1/25/22 A: moderate persistent asthma with acute exacerbation, personal
hx of COVID19, dyspnea, cough, obesity.
Synopsis of Clinical Course:
The purpose of this CA is to determine if the insured is precluded from performing
the full time functional demands as outlined by VRC from 6/16/21 through 12/12/21
and beyond.
EE is a 52yo (6', 258lbs) LPN ldw 6/15/21 OOW d/t shortness of breath, post-viral
fatigue syndrome, and cough.
OI - Physical Demands:
Medium Work: Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds
of force frequently, and/or greater than negligible up to 10 pounds of force
constantly to move objects.
Frequent: standing, stooping, talking, handling, reaching, reaching upward
Occasional: sitting, walking, kneeling, crouching,
Diagnostics:
8/31/21 CTA of coronary arteries - hypoventilatory changes in the lung bases more
focal patchy infiltrate in the right base. This may be assessed clinically and
followed with chest radiography if clinically relevant. There is bronchial wall
thickening of indeterminate chronicity. This may be seen with an infectious
inflammatory bronchitis. There is no bronchial occlusion. There is mild aneurysmal
dilatation of the ascending aorta. Mild cardiomegaly with mild coronary artery
calcification.
8/31/21 ECHO - LVEF normal 55%. No regional wall motion abnormalities detected.
Cardiac chamber dimensions appear normal. No significant vascular pathology
detected. No shunts, masses, or significant effusions are detected.
9/1/21 cardiac MRI - cardiac MRI features suggestive of possible prior myocarditis.
Cardiac chamber dimensions are normal as well as biventricular systolic function EF
60%. There was a patchy distribution of subepicardial myocardial fibrosis mostly at
the basal anteroseptum/anterior segment as well as the inferior RV insertion point
of the septum. While nonspecific, this pattern may indicate prior myocarditis. No
evidence of active myocardial and/or pericardial edema. Ectatic mild ascending
thoracic aorta, measuring approximately 4.1cm in diameter.
Dr. Gary Bowman, Family Medicine
7/9/21 OV - post-COVID f/u. physical exam is unremarkable. A/P: hypokalemia- BMP.
Acute kidney injury. Pneumonia d/t COVID19 virus.
7/21/21 OV - hospital follow up. Abdominal pain RLQ, radiates to right flank and
back. Shortness of breath, associated sxs include headaches, cough, wheezing, and
abdominal pain. 7/2/21 presented to St. Vincent in Morrilton and transferred same
day to be admitted at CRMC on 6/26/21 with hypoxia and COVID pneumonia. Dx with
COVID 6/16/21. SOB at rest and exertion along with frequent stools. Placed on

supplemental oxygen. Rotating position in bed including prone position. Deep breathing encouraged. Labs showed potassium 3.3, AKI with creatinine 1.4, elevated AST 73, elevated T bili 1.2. WCB, Hgb, platelets normal. Given IV fluids, dexamethasone, remdesivir, vit C, vit D3, thiamine, and ivermectin. Pt has not had the COVID vaccine. Resume home atenolol and monitor BP at home. Continue Pepcid. Creatinine normalized. Diarrhea improved. AKI resolved. Home with 2L NC. Continue oral steroids for a few days. Regular diet. Pt to quarantine until 7/6/21.
Discharged 7/1/21. Exam notes wheezing present otherwise unremarkable. A/P: pneumonia d/t COVID19. Shortness of breath on exertion. Wheezing. Trelegy Ellipta rx. Continues to recover from her episode of COVID she has pronounced SOB with activity, she has wheezing when lying flat in bed, still has a cough that is sometimes productive and denies any fever. She says she fatigues very easily and her stamina is limited. Because of the fact she is not able to return back to work as an LPN at the Conway human development center at this time. Told her will check her every 7-10 days to measure her progress and release her to work when possible. Discussed the known diagnosis of COVID long-hauler and told her she may be in that category the length of COVID complications is very variable and cannot yet be determined in her case.
8/5/21 OV - shortness of breath. Gradually worsening. Headaches, cough, wheezing, chest pain. chest pain- unchanged, substernal region. Cough, headaches, malaise/fatigue, near-syncope, palpitations, shortness of breath, weakness. Physical exam unremarkable. A/P: pneumonia d/t COVID19, chest pain.
8/26/21 OV - f/u to discuss FMLA. Still c/o weakness and SOB worse with exertion. Consulted with Dr. Gojer and has upcoming appt scheduled for CT coronary angiogram, cardiac MRI, and echo. f/u with Dr. Gojer within 3 weeks after the testing has been done. Physical exam unremarkable. A/P: pneumonia d/t COVID19, chest pain, SOB on exertion.
9/10/21 OV - alopecia. States has been occurring for more than 6 months. physical exam unremarkable. A/P: alopecia.
9/28/21 OV - wants to discuss extending work leave. Pertinent negatives include no abdominal pain, arthralgias, chest pain, chills, congestion, coughing, fatigue, fever, headaches, nausea, rash, sore throat, vomiting, or weakness. Physical exam unremarkable. A/P: COVID19, SOB, anxiety, insomnia, postviral fatigue syndrome. Patient continues to have shortness of breath, fatigue, anxiety, insomnia, and generalized weakness since she has had COVID. Her sxs are consistent with long hauler's COVID. Will make an appt for her to see pulmonologist for evaluation and sending her for counseling concerning her sxs of anxiety associated with her disease as she may have PTSD. Paxil 20mg at bedtime rx.
11/3/21 OV - f/u. PHQ-9 score 20 severe depression. A/P: positive depression screening, postviral fatigue syndrome, COVID19, shortness of breath. Trazadone 150mg 1/3, 1/2 to 1 tablet at HS.
Dr. Bernard Gojer, Cardiology
8/18/21 OV - essential HTN but otherwise very healthy, no chronic medical conditions. Was doing well up to a few months ago, no chest pain, tightness, or SOB, was very physically active. Then in June 2021 contracted COVID19 pneumonia. Hospitalized for a week. "Came close to being intubated" but turned the corner and was d/c without intubation. Since that time has continued to have SOB and cough, low energy and stamina. In addition started having a "squeezing" or "tightness" type chest "pressure of pain" in her mid precordium and upper left shoulder and arm. describes intermittent palpitations or "fluttering" sensation. Tends to happen when she is very SOB or having the "chest pains." Sxs have continued to recur over last month. Never had any of these sxs before COVID19. ECG shows NSR with nonspecific ST and T wave changes. BP 164/101. Exam unremarkable. A/P: Hx COVID 19- severe COVID infection with hospitalization and respiratory failure with near intubation. Had a lot of persistent sxs since then. Suspect most of her sxs are likely d/t slow recovery from COVID19 pneumonia. However, possibility of myocarditis, cardiomyopathy, CAD need to be considered. Precordial pain- with exertion. Abnormal EKG. Strong family hx of premature heart disease. however sxs only started after COVID. Suspect COVID myocarditis. Will get cardiac MRI to assess. Given family hx will also get CT coronary angiogram to r/o CAD and look at her ascending aorta. SOB on exertion- post COVID. Most likely residual effect from COVID19. Suspect she has some myocarditis as well. Heart palpitations- nonspecific, mostly consistent with PVCs. f/u echo/doppler, 30 day event monitor, cardiac MRI,

CT coronary angiogram. f/u 3 weeks.

9/7/21 telehealth - findings of testing reviewed with patient. Recommend continuing medical Rx. Get the event monitor. Will do telehealth in one month. Will need to follow the ascending aorta aneurysm with a follow up study in one year. f/u in office in 6 months.

3/16/22 OV - 12/19/22 (21?) event monitor: NSR throughout, intermittent sinus tachycardia, rare PACs, no pathologic arrhythmias. Patient triggered events all correlated to NSR only. Patient continues to do well. No change. Still having intermittent atypical symptoms. BP 110/81. Physical exam unremarkable. A/P: hx of 2019 novel coronary virus disease, precordial pain, SOB on exertion, family hx of premature CAD, heart palpitations, myocarditis d/t COVID19. Continue current medical rx. f/u visit in 6 months.

Dr. Ladly Abraham, Pulmonology

10/20/21 OV - initial visit. Hx COVID and dyspnea, presents to management of SOB. Dx with COVID on 6/15 and was hospitalized from 6/26-7/1. Persistent pleuritic chest pain bil and associated dyspnea. Can only walk about 10min out of the day d/t SOB. Used to walk an hour/day pre-COVID. Has difficulty doing ADLs now. Can walk 50-100 feet before having to stop. Lost about 10lbs in last year. MMRC score 3 (severe, stops for breath after walking for a few minutes on level ground). CT done 8/31 showed thickened bronchi, patchy GGO in the right lung base, questionable pneumonitis and atelectasis. Multiple sxs concerning for OSAS. Very loud snorer with frequent nocturnal arousals, unrefreshed sleep, daytime sleepiness. Exam unremarkable. O2 96%. A/P: dyspnea- etiology likely from recent COVID infection. Would like to r/o post COVID asthma, PE as a contributor. Her echo and coronary CT on 8/31 did not show any acute findings. Chest pain- will check CTA to r/o PE as a cause. Pleurisy may also contribute to this and may response to steroids. Hypersomnia- has multiple sxs concerning for OSAS. Will schedule sleep evaluation and make further recommendations.

11/30/22 OV - PFT 11/30/21 showed FEV1/FVC ratio 0.80, FEV1 85%, FVC 84%, TLC NA%, DLCOc 75%. CT 11/24/21 showed no evidence of pulmonary embolic disease. minimal haziness in lung fields to represent mild atelectasis. She did have CTA of coronaries however document is blank and computer cannot process document. O2 99%. Exam unremarkable. dyspnea- CT looked fine. No nodules or anything to demonstrate malignancy. Her PFT did have a slight drop in O2 exchange around 75%. Both PFT and CT were unremarkable. Instructed patient from a pulmonary standpoint she is fine. Referred her back to Dr. Gojer to check her heart and obtain the same cardiac workup for my office. Cough- will schedule for methacholine challenge to r/o asthma diagnosis. Hx COVID19- CT scan looked fine and showed no haziness.

1/25/22 OV - moderate persistent asthma with acute exacerbation- continue Breztri, start Ventolin inhaler. Her MCT is positive at 16mg/dl. Discussed risks associated with frequent exacerbations and stressed importance of diligence with daily inhaler use.


Per ILTPC, she has problems with fatigue that affects everything, stays in bed a lot. Normally needs help with chores around the house, daughter has been helping a lot. Able to drive, goes to laundromat to do her laundry but only when she absolutely has to because that's so difficult for her, takes her a long time, doesn't really leave the house unless she has to. She really can't do any household chores, daughter does almost everything. Can fix simple meals, heating things up like soup or making a sandwich. Has trouble taking a shower, definitely can't do a bath because she can't get herself out of the tub well. in the shower it's like she doesn't have the strength to even finish. Can do her ADLs unassisted, just takes a while.

Conclusion with Analysis and Rationale:

Restrictions and limitations precluding the insured from performing the full time functional demands as outlined by VRC are not clearly supported.

PCP documents that the insured was d/c from hospital on 2L O2, however per ILTPC the insured reports she wasn't on oxygen when she was d/c.

PCP notes the insured experiences generalized weakness, however physical exams do not document any weakness.

The insured reports fatigue and reported in ILTPC she is in bed a lot, however there is no documentation of the number of hours the insured is sleeping at night or during the day.

The insured complaints of chest pain/tightness. Cardiac testing revealed mild aneurysmal dilatation of ascending aorta, mild cardiomegaly with mild coronary artery calcification, and MRI features suggestive of possible prior myocarditis. EF estimated 55% and 60% per testing. Event monitor did not show any pathologic arrhythmias.
The insured is noted to have moderate asthma. Physical exams have been mostly unremarkable, with the exception of wheezing noted at the 7/21/21 OV. There has been no documentation of wheezing since that time.
The insured complains of shortness of breath, however Pulmonology documents that both PFT and CT were unremarkable.
Referral Questions and Answers:
Based on the available medical information, is the insured precluded from performing the full time functional demands as outlined by the VRC from 6/16/2021 through 12/12/2021 and beyond?  If yes, please outline the expected duration.
R/Ls are not clearly supported.
ICD (delete if not applicable):   R06.02 & U09.9
Next Steps: Forum with OSP
Certification I have reviewed all medical and clinical evidence provided by the Company personnel bearing on the impairment(s) which I am by training and experience capable to assess.
CC Signature & Credentials:   Kathryn Knight, RN

Completed By: Knight, Kathryn
Completed Date: 04/26/2022 11:05:25      Complete Site: Chattanooga

Activity
--------------------------------------------------------------------------------

Checked/Unchecked Indicator: No
Type: CVM        Name: Doctoral Review
Status: Completed
Original Notify Date: 04/28/2022
Notify Date: 04/28/2022
Due Date:
Subject: OSP WR
Upon Completion Notify: Claim Owner
Upon Completion Notify Linked Claim Owner(s): No
Mark As Priority: No
Activity Owner: Belanger, Elizabeth
Action: R/L's Not Supported

Request Fields
------------------------------------------------------------------------
Claim Overview: Lacey, Jenna 04/28/2022 11:41:48: 52 yo LPN oow due to shortness of
breath, post-viral fatigue syndrome and cough. EE reports treatment with family
medicine, pulmonology and cardiology, however per EE, only pulmonology is asserting
RLs. No RLs on file other than what was rcvd from pulm on 4/26 - pt to avoid any
activity/exertion that is intolerable, prolonged periods of
standing/walking/lifting/pushing/pulling - undetermined duration. EE reports she
has never been on oxygen.


Medical Issue to be addressed:  Based on the available medical information, is the
insured precluded from performing the full time functional demands as outlined by
the VRC from 6/16/2021 through 12/12/2021 and beyond?  If yes, please outline the
expected duration.

Physical Demands:

Medium Work: Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds
of force frequently, and/or greater than negligible up to 10 pounds of force
constantly to move objects.

Frequent: standing, stooping, talking, handling, reaching, reaching upward
Occasional: sitting, walking, kneeling, crouching,



Created By: Lacey, Jenna
Created Date: 04/28/2022 11:41:48        Create Site: Chattanooga

Response Fields
------------------------------------------------------------------------
Response: Belanger, Elizabeth 05/13/2022 13:00:36: Doctoral Review

Claimant Name: Tanya Parker
Claim Number: 21070146
DBS Name: Jenna Lacey
Completion Date: 5/13/2022

Name of reviewing operations physician (OSP): Elizabeth Belanger, MD
Specialty of reviewing operations physician: Internal Medicine, Infectious Diseases


Restrictions and Limitations as stated by AP:
Dr. Ladly Abraham, MD, Pulmonology
4/25/22 R&Ls: Avoid any activity exertion that is intolerable. Prolonged periods of
standing, walking, lifting, pushing, pulling. Begin: 6/17/21 End:

EXHIBIT

6

Current/undetermined
4/28/22 AP Contact: No response has been received at the time of completion of this document

Medical Issue:
The insured is a 52-year-old Licensed Practical Nurse (LPN) for Arkansas State Employees who has been out of work since 6/16/21 due to Covid-19 infection with persistent dyspnea, cough and fatigue in the setting of moderate persistent asthma and evidence of possible myocarditis.

She was initially diagnosed with Covid-19 infection on 6/15/21 and was admitted from 6/26/21 through 7/1/21 for hypoxia and pneumonia with acute kidney injury. She was treated with supplemental oxygen, prone positioning, steroids, intravenous fluids, remdesivir and ivermectin but did not require intubation during her hospitalization. Her kidney injury resolved prior to discharge and the insured reports she did not require supplemental oxygen post hospitalization.

She has followed with primary care, pulmonology and cardiology for chest pain, palpitations, and continued dyspnea with cough since her hospitalization with cardiac MRI imaging demonstrating evidence of possible prior myocarditis. Behavioral health treatment with a family medicine provider other than the insured's primary care provider is also reported, but these records are not submitted for review.

The purpose of this medical review is to assess whether the sum of the medical evidence in the file supports restrictions and limitations precluding the insured from full time participation in medium occupational demands from 6/16/21 through 12/12/21, consisting of:

Exerting 20 to 50 pounds of force occasionally
Exerting 10 to 25 pounds of force frequently
Exerting greater than negligible up to 10 pounds of force constantly to move objects
Frequent standing, stooping, talking, handling, reaching, reaching upward
Occasional sitting, walking, kneeling, crouching

Note: Definitions of Frequency per The Revised Handbook for Analyzing Jobs
Occasional = 0-33% of the workday (0 - 2 ½ hours per 8-hour day)
Frequent = 34-66% of the workday (2 ½ - 5 ½ hours per 8-hour day)
Constant = 67-100% of the workday (5 ½ - 8 hours per 8-hour day)

Conclusions:
Restrictions and limitations are not supported.

Analysis and rationale:
I have considered all the medical and behavioral health conditions, both individually and in aggregate, and given significant weight to the attending physician. With reasonable medical certainty, the evidence does not support restrictions and limitations precluding the insured from full time participation in the occupational demands detailed above from 11/30/21 for the following reasons:

Diagnoses: Dyspnea, cough and post viral fatigue after Covid-19 pneumonia requiring hospitalization and temporary supplemental oxygen June of 2021 in the setting of moderate persistent asthma and possible myocarditis

Physical exam findings do not support that the insured is precluded from performing the occupational demands.
No abnormal breath sounds, wheezing or respiratory distress are noted on any submitted exams since a primary care exam in August of 2021.
All submitted pulse oximetry values are normal.
Although the insured indicates fatigue as limiting, fatigue is not discussed with

any provider or noted on review of systems documentation from primary care, cardiology, or pulmonary office visits since the 9/28/21 primary care visit. No submitted exams document weakness or describe the insured as fatigued.

8/18/21 cardiology exam describes the insured as alert and oriented with normal heart and breath sounds and normal gait.

9/10/21 and 9/28/21 primary care exams with Dr. Bowman document normal breath sounds, heart sounds, pulmonary effort, and coordination. The insured is noted to be alert and oriented with normal behavior in both visits. No exam is documented during the 11/3/21 primary care exam.

10/21/21, 11/30/21 and 1/25/22 pulmonology exams describe the insured as pleasant and in no distress with clear lungs, normal cardiac exams, non-focal neurological testing with normal strength in all extremities and intact sensation despite mild tachycardia (101 to 103) noted on vitals from all three visits.

Intensity of management is inconsistent with the nature, severity, persistence and impact of reported symptoms.

11/30/21 and 1/25/22 pulmonary plans specify that the insured is "fine" from a pulmonary standpoint and refer her back to cardiology.

Cardiology office visits from 9/7/21 and 3/16/22 each recommend 6 month follow up. Albuterol use was noted during the 10/20/21 pulmonology visit and Ventolin was ordered during the 1/25/22 pulmonology visit, but during a 4/8/22 telephone call with her claims team the insured indicated that she was only using her maintenance Breztri inhaler and albuterol may be added if she worsens.

Although primary care documentation suggests supplemental oxygen was prescribed at the time of discharge, the insured confirmed during a 4/8/22 telephone call with the benefits specialist that she did not use supplemental oxygen post hospitalization.

No interventions for fatigue or deconditioning such as pulmonary or cardiac rehabilitation or physical therapy are documented as completed, ordered, or recommended.

No urgent or emergent visits for dyspnea, fatigue, chest pain, palpitations, headaches, or acute treatment for asthma flares with prednisone or nebulizers since discharge in 7/2021 are described in the record or submitted for review.

After a reassuring cardiac work up discussed below, the insured's pre-admission atenolol remained unchanged throughout the submitted record and only periodic imaging to monitor the identified thoracic aortic ectasia was recommended.

Diagnostic testing does not support that the insured is precluded from performing the occupational demands.

11/30/21 pulmonary function testing (PFTs) results demonstrated normal values summarized as an FEV1 of 85% predicted, FVC of 84% predicted, and DLCO of 75% predicted and were described as "unremarkable" in the 11/30/21 pulmonology note.

Although the 10/20/21 pulmonology note summarizes findings from an 8/31/21 CT as showing thickened bronchi and patchy ground glass opacities in the right lung base with questionable pneumonitis and atelectasis, 11/24/21 CT angiogram of the chest noted only mild haziness in the lung fields felt to represent mild atelectasis and specified resolution of previously identified ground glass opacities. No evidence of pulmonary emboli or thoracic lymph adenopathy were identified.

9/1/21 cardiac MRI demonstrated non-specific MRI changes suggestive of possible prior myocarditis but no evidence of active myocardial or pericardial edema were found and normal ejection fractions ranging from 55% to 62% were measured on all submitted imaging modalities.

While mild (Stage 1) diastolic dysfunction was described on the 8/31/21 echocardiogram, no wall motion abnormalities or valvular abnormalities were identified on any imaging and the insured's beta blocker therapy remained the same as noted above.

Cardiac evaluation including transthoracic echocardiogram, cardiac MRI, and CT angiogram of the coronary arteries in August and September of 2021 demonstrated ascending thoracic ectasia measuring 4.1cm, but only periodic monitoring with echocardiogram was recommended for this finding.

8/31/21 coronary artery CT scan described angiographically normal appearing coronary arteries and estimated a normal left ventricular ejection fraction of 62%.

8/31/21 transthoracic echocardiogram was normal with normal estimated left

ventricular ejection fraction of 55% and cardiac chamber dimensions, normal observed left ventricular function without regional wall abnormalities, and no significant valvular pathology or effusions identified, suggesting that although evidence of possible prior myocarditis was noted on MRI, this has not resulted in significant depression of cardiac function that would be expected to produce symptoms or preclude performance of the defined occupational demands.
30-day Holter monitor in December 2021 was interpreted as showing normal sinus rhythm at baseline with intermittent sinus tachycardia; patient reported events correlated with normal sinus rhythm. Per cardiology notes, no pathologic arrhythmias were identified.
Methacholine challenge testing 1/25/22 indicated a diagnosis of asthma, but records indicate that maintenance inhaler dosing was not changed after August of 2021 when it was switched from Trelegy Ellipta to Breztri.

The following tests and laboratory results, although not directly used to determine functionality, found no abnormalities that would correlate with the level of reported impairment:
9/10/21 laboratory evaluation reveals normal thyroid stimulating hormone (TSH), hemoglobin hematocrit, platelet, white blood cell count, hemoglobin A1C, and electrolyte levels.
The 9/10/21 creatinine level appears to be mildly elevated (1.03 with an estimated glomerular filtration rate between 63 and 73) based on submitted normal values for the performing laboratory, but it is unclear from the record what the insured's pre-admission baseline creatinine had been, this value is improved from the 7/9/21 creatinine of 1.11 and inpatient value of 1.4, and this level of elevation would not be expected to result in symptoms or limitations.


Co-Morbid and Co-Existing Conditions:
The insured's other diagnoses are not being opined as impairing. There are no restrictions and limitations provided for these conditions. On analysis, these issues do not rise to the level of impairment that would warrant any restrictions or limitations. The file includes references to comorbid and coexisting conditions including:
Obesity, hypertension
Status post laparoscopy with total hysterectomy and salpingo-oophorectomy 11/23/20

Although the insured reports following with a family medicine provider Dr. John Dickson for behavioral health management, medications including fluoxetine, trazodone and Dayvigo are noted throughout the record, and paroxetine is started in September 2021 by Dr. Bowman to treat anxiety and described as working well by the insured during the 11/3/21 primary care office visit with Dr. Bowman, no records from Dr. Dickson are submitted for review. The insured is not claiming, and no providers are asserting restrictions or limitations related to behavioral health conditions. On analysis, these issues do not rise to the level of impairment that would warrant any restrictions or limitations.

The records do not indicate that medication side effects are resulting in restrictions or limitations.

Referral Questions and Answers:
Does the evidence in the file support restrictions and limitations precluding the insured from performing the occupational demands detailed above, from 6/16/21 through 12/12/21?

No, the benign cardiopulmonary work up, stable low intensity of management, and benign exams reflected in the file do not support that the insured would be precluded from performing the outlined occupational demands on a full-time basis as of 11/30/21.

Next steps:
DMO review

There is adequate medical information included in the file upon which to formulate
an opinion regarding the functional implications of the available data; therefore,
a hands-on exam by an IME is not needed.

I have reviewed all medical and clinical evidence provided to me by company
personnel bearing on the impairment for which I am by training and experience
capable to assess.

Elizabeth Belanger, MD
Medical Consultant
UNUM
Licensure: Oregon
Board Certification: Internal Medicine, Infectious Diseases

Completed By: Belanger, Elizabeth
Completed Date: 05/13/2022 13:00:36     Complete Site: Chattanooga

**Designated Medical Officer (DMO) Review Response**

**Claimant Name:**   Tanya Parker

**Claim Number:**   21070146

**Date of DMO Review:**  05/24/22

**Conclusion**

I concur with the OSP opinion.

**DMO Analysis**

The insured is a 52-year-old Licensed Practical Nurse (LPN) for Arkansas State Employees who has been out of work since 6/16/21 due to Covid-19 infection with persistent dyspnea, cough, and fatigue in the setting of moderate persistent asthma, and evidence of possible myocarditis.

She was initially diagnosed with Covid-19 infection on 6/15/21 and was admitted from 6/26/21 through 7/1/21 for hypoxia and pneumonia with acute kidney injury. She was treated with supplemental oxygen, prone positioning, steroids, intravenous fluids, remdesivir, and ivermectin but did not require intubation during her hospitalization. Her kidney injury resolved prior to discharge and the insured reports she did not require supplemental oxygen post-hospitalization.

She has followed with primary care, pulmonology, and cardiology for chest pain, palpitations, and continued dyspnea with cough since her hospitalization with cardiac MRI imaging demonstrating evidence of possible prior myocarditis. Behavioral health treatment with a family medicine provider other than the insured's primary care provider is also reported, but these records are not submitted for review.

Occupational demands:
- Exerting 20 to 50 pounds of force occasionally.
- Exerting 10 to 25 pounds of force frequently.
- Exerting greater than negligible up to 10 pounds of force constantly to move objects.
- Frequent standing, stooping, talking, handling, reaching, reaching upward.
- Occasional sitting, walking, kneeling, crouching.

Note: Definitions of Frequency per The Revised Handbook for Analyzing Jobs
Occasional = 0-33% of the workday (0 - 2 12 hours per 8-hour day).
Frequent = 34-66% of the workday (2 12 - 5 12 hours per 8-hour day).
Constant = 67-100% of the workday (5 12 - 8 hours per 8-hour day).

The attending physician, pulmonologist Dr. Ladly Abraham, MD, asserts that the insured is restricted from performing the occupational demands listed above.

The onsite physician finds that the submitted medical evidence does not demonstrate that the insured is precluded from full-time participation in the medium occupational demands outlined above as of 11/30/21.

Based on the available medical records, the preponderance of the evidence does not support that the insured is precluded from performing the required physical demands of her occupation from a pulmonary medicine perspective.

**EXHIBIT**

**7**

The insured is a 52-year-old female (LPN for Arkansas State Employment) with a PMH of hypertension, obesity, and possible obstructive sleep apnea (OSA) who developed COVID-19 pneumonia on 06/16/2021 with associated acute hypoxemic respiratory failure. The insured was hospitalized from 06/16/21 - 07/01/21 and treated with high-flow oxygen, dexamethasone, remdesivir, multi-vitamins, since, and ivermectin. She was discharged home initially with supplemental oxygen at 2L/minute and a tapering dose of corticosteroids. The oxygen was weaned off, but the insured was maintained on inhaled corticosteroids.

The insured continued to have symptoms of persistent shortness of breath (SOB), nonproductive cough, fatigue, chest pain, and palpitations. She was initially referred to a cardiologist where evaluation and tests were performed. Specifically, a cardiac MRI, CTA of the coronary arteries, and echocardiogram The MRI showed evidence of a possible myocarditis/myocardial fibrosis with relatively normal (borderline low) left ventricular ejection fractions of 55-60% on this test and a surface echocardiogram. The CTA of the coronary arteries/chest did show bronchial wall thickening consistent with an inflammatory/infectious condition and "marked hypo ventilatory changes" in the right lower lobe consistent with the previous COVID pneumonia.

The insured was subsequently seen by a pulmonologist with pulmonary function tests (PFTs) being essentially normal (with the exception of an increased RV/TLC ratio of 141% off predicted and a mild reduction in diffusion capacity of 75% with normalized when corrected to alveolar volume; this could be related to obesity). Physical examinations, from a respiratory standpoint, have been normal/unremarkable. The methacholine test (bronchoprovocation) was positive at higher dosing levels which can be consistent with reactive airways disease/asthma. The attending pulmonologist, as of 01/25/2022, stated the insured may have moderate persistent asthma. The insured was continued on a maintenance inhaler (Breztri) and albuterol as needed. It was further stated in the medical records from the pulmonologist that the was instructed she was fine from a pulmonary medicine standpoint and was referred back to the attending cardiologist.

Therefore, I agree with the OSP opinion.

**Certification:** I have reviewed all medical and clinical evidence provided to me by Company personnel bearing on the impairment(s) for which I am by training and experience capable to assess.

**DMO Signature Block:**

Name:    Alan Atkinson D.O.
State of Licensure:    MI#5101008833
Board Certification:    Pulmonary Disease (DO)
Unum

Unum
The Benefits Center
PO Box 100158
Columbia, SC 29202-3158
Phone: **1-800-858-6843**
Fax: **1-800-447-2498**
www.unum.com



May 27, 2022

TANYA PARKER
PO BOX 3832
BATESVILLE, AR 72503

RE:    Parker, Tanya
       Claim Number:         21070146
       Policy Number:        410275
       Unum Life Insurance Company of America

We have completed our review of your Long Term Disability claim and are unable to approve your benefits.  Please review this entire letter as it will help you understand how we reached this decision.

| Long Term Disability Claim Number: 21070146 | Contact Us |
|---|---|
| **Last Day Worked:** June 15, 2021 | **Mobile App and Online:** www.unum.com/claims Securely submit documentation and access claim information |
| **Date of Disability:** June 16, 2021 | **Direct:** Jenna Lacey 1-800-858-6843 extension, 49155 |
| **Elimination Period:** 180 days during which time benefits are not payable | **Call Center:** 1-800-858-6843 8am - 8pm ET, Mon-Fri |
| **Elimination Period End Date:** December 12, 2021 | |

EXHIBIT

8

1242-03    UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.

Claimant Name: Parker, Tanya
Claim Number: 21070146

May 27, 2022
Page 2 of 8

**Decision/Reason**

We have determined your records do not support the restrictions and/or limitations in your functional capacity as stated by Dr. Ladly Abraham beyond November 30, 2021. Instead, we find your records support a conclusion that you did not meet the policy definition of disability December 01, 2021, forward. Therefore, we are unable to approve your claim.

**Information That Supports Our Decision**

You filed a claim for disability benefits due to post-COVID symptoms including shortness of breath, post-viral fatigue syndrome, and cough. You and your physician told us that these conditions prevent you from performing your regular occupational duties.

The Long Term Disability policy says your benefits begin after you have been continuously disabled for 180 days. The policy calls this period the elimination period. Since your disability began on June 16, 2021, your elimination period would have ended on December 12, 2021.

To complete our decision on your claim, we needed to understand both your regular occupational duties as well as your functional capacity to determine if you met the definition of disability throughout the elimination period.

A vocational rehabilitation consultant reviewed your file and concluded your occupational duties require medium level work in the national economy. The occupation requires:

- Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects.
- Frequent: standing, stooping, talking, handling, reaching, reaching upward
- Occasional: sitting, walking, kneeling, crouching

Definitions of Frequency per The Revised Handbook for Analyzing Jobs:
'Occasionally'= Activity or condition exists up to 1/3 of the time (0 - 2.5 hours a day in an 8-hour workday)
'Frequently' = Activity or condition exists from 1/3 to 2/3 of the time (2.5 - 5.5 hours a day in an 8-hour workday)
'Constantly' = Activity or condition exists 2/3 or more of the time (5.5+ hours a day in an 8-hour workday)

We reviewed the information submitted with your claim as well as your medical records from Dr. Ladly Abraham (pulmonology), Dr. Bernard Gojer (cardiology), and Dr. Gary Bowman (family medicine) to determine if your medical condition prevented you from performing your occupational duties.

On a form dated April 08, 2022, Dr. Ladly Abraham noted avoid any activity/exertion that is intolerable. Prolonged periods of standing/walking/lifting/pushing/pulling. You confirmed in our initial telephone call on April 08, 2022, that Dr. Abraham is the only medical provider asserting work restrictions. You also reported that you have no other conditions and that everything is related to post COVID syndrome.

Dr. Bowman's office advised restrictions and limitations were deferred to Dr. Abraham as of your November 03, 2021, office visit. No other provider has provided restrictions regarding your work or functional status.

We had a physician, board certified in internal medicine, contact Dr. Abraham to inquire about your functional capacity. Dr. Abraham did not respond to the physician's attempt to make contact. Since the reviewing physician did not agree with Dr. Abraham's previously stated restrictions, the physician completed a full review of your medical records.

The reviewing physician found no support beyond November 30, 2021, for restrictions that would have prevented you from performing the full-time activities required in your occupational duties. In reaching this conclusion, the reviewing physician noted the following:

- Physical exam findings do not support that you are precluded from performing the occupational demands. No abnormal breath sounds, wheezing or respiratory distress are noted on any submitted exams since a primary care exam in August of 2021. All submitted pulse oximetry values are normal. Although you indicate fatigue as limiting, fatigue is not discussed with any provider or noted on review of systems documentation from primary care, cardiology, or pulmonary office visits since the September 28, 2021, primary care visit. No submitted exams document weakness or describe the insured as fatigued.
- September 10, 2021, and September 28, 2021, primary care exams with Dr. Bowman document normal breath sounds, heart sounds, pulmonary effort, and coordination. You are noted to be alert and oriented with normal behavior in both visits. No exam is documented during the November 03, 2021, primary care exam. October 21, 2021, November 30, 2021, and January 25, 2022, pulmonology exams describe you as pleasant and in no distress with clear lungs, normal cardiac exams, non-focal neurological testing with normal strength in all extremities and intact sensation despite mild tachycardia (101 to 103) noted on vitals from all three visits.
- Intensity of management is inconsistent with the nature, severity, persistence, and impact of reported symptoms. November 30, 2021, and January 25, 2022, pulmonary plans specify that you are "fine" from a pulmonary standpoint and refer you back to cardiology. Cardiology office visits from September 07, 21 and March 16, 2022, each recommend 6 month follow up.
- Although primary care documentation suggests supplemental oxygen was prescribed at the time of your hospital discharge, you confirmed during an April 08, 2022, telephone call with the benefits specialist that you did not use supplemental oxygen post hospitalization. No interventions for fatigue or deconditioning such as pulmonary or cardiac rehabilitation or physical therapy are documented as completed, ordered, or recommended.
- No urgent or emergent visits for dyspnea, fatigue, chest pain, palpitations, headaches, or acute treatment for asthma flares with prednisone or nebulizers since discharge in July 2021 are described in the record or submitted for review. After a reassuring cardiac work up discussed below, your pre-admission atenolol remained unchanged throughout the submitted record and only periodic imaging to monitor the identified thoracic aortic ectasia was recommended.
- Diagnostic testing does not support that you are precluded from performing the occupational demands. November 30, 2021, pulmonary function testing (PFT) results demonstrated normal values and were described as "unremarkable." CT angiograms, cardiac MRIs, and echocardiograms performed in November 2021, September 2021,

Claimant Name: Parker, Tanya
Claim Number: 21070146

May 27, 2022
Page 4 of 8

and August 2021 demonstrated normal ejection fractions with no significant depression of cardiac function that would be expected to produce symptoms or preclude performance of the defined occupational demands. 30-day Holter monitor in December 2021 was interpreted as showing normal sinus rhythm at baseline with intermittent sinus tachycardia; patient reported events correlated with normal sinus rhythm. Per cardiology notes, no pathologic arrhythmias were identified.

- The performed tests and laboratory results, although not directly used to determine functionality, found no abnormalities that would correlate with the level of reported impairment. September 10, 2021, laboratory evaluation reveals normal thyroid stimulating hormone, hemoglobin hematocrit, platelet, white blood cell count, hemoglobin A1C, and electrolyte levels. The creatinine level appears to be mildly elevated at this time based on submitted normal values for the performing laboratory, but it is unclear from the record what your pre-admission baseline creatinine had been, and this value is improved from the July 09, 2021, creatinine levels, which would not be expected to result in symptoms or limitations.
- No other diagnoses are being opined as impairing, and there are no restrictions and limitations provided for any other medical conditions.

Since the reviewing physician disagreed with Dr. Abraham, a second physician board certified in pulmonary disease also reviewed your file. The second reviewing physician agreed with the first reviewing physician, that the submitted medical evidence does not demonstrate that you are precluded from full-time participation in your occupational demands beyond November 30, 2021. In reaching this conclusion, the second physician noted the following:

- While you continued to report symptoms of persistent shortness of breath, nonproductive cough, fatigue, chest pain, and palpitations, your cardiology MRI, CTA of the coronary arteries, and echocardiogram were reportedly normal.
- Your pulmonary function tests performed by your pulmonologist were essentially normal.
- Physical examinations, from a respiratory standpoint, have been normal/unremarkable.
- It was stated in the medical records from the pulmonologist that you were "fine from a pulmonary medicine standpoint" and you were referred to the attending cardiologist.

In conclusion, the reviewing physicians have agreed your records support a finding that by November 30, 2021, you had the ability to perform full-time activity at a level that is consistent with the demands of your occupational duties. As a result, we find you no longer met the definition of disability after November 30, 2021. Therefore, you did not meet the policy definition of disability throughout and beyond the policy elimination period of December 12, 2021. Therefore, we are unable to approve your claim for benefits.

If you have additional information, you may submit for review.

**Policy Provisions**

We relied upon your policy when making our decision, including provisions and exclusions listed below, and the Company reserves its right to enforce other provisions of the policy.

Claimant Name: Parker, Tanya
Claim Number: 21070146

## HOW DOES UNUM DEFINE DISABILITY?

You are disabled when Unum determines that:

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

You must be under the regular care of a physician in order to be considered disabled.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

MATERIAL AND SUBSTANTIAL DUTIES means duties that:

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified.

REGULAR OCCUPATION means the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

## HOW LONG MUST YOU BE DISABLED BEFORE YOU ARE ELIGIBLE TO RECEIVE BENEFITS?

You must be continuously disabled through your elimination period. Unum will treat your disability as continuous if your disability stops for 30 days or less during the elimination period. The days that you are not disabled will not count toward your elimination period.

Your elimination period is 180 days.

You are not required to have a 20% or more loss in your indexed monthly earnings due to the same injury or sickness to be considered disabled during the elimination period.

ELIMINATION PERIOD means a period of continuous disability which must be satisfied before you are eligible to receive benefits from Unum.

The policy also states:

Otherwise, your coverage under the policy or a plan ends on the earliest of the following:

- the date the policy or a plan is cancelled;
- the date you no longer are in an eligible group;
- the date your eligible group is no longer covered;
- the last day of the period for which you made any required contributions; or
- the last day you are in active employment.

However, as long as premium is paid as required, coverage will continue:

- while benefits are being paid;
- while you are fulfilling the requirements of your elimination period; or
- in accordance with the layoff and leave of absence provisions of this policy or plan.

Unum will provide coverage for a payable claim which occurs while you are covered under the policy or plan.

**Next Steps Available to You**

If you disagree with our decision, you may request an appeal.

**What is an Appeal?**

An appeal is your written disagreement with our claim decision and a request for a review of that decision.

**How do you request an Appeal?**

You will need to submit a written letter of appeal outlining the basis for your disagreement.  To ensure handling of your appeal without delay, please include any additional information you would like considered.  This information may include written comments, documents, or other information in support of your appeal.

**How much time do you have to request an Appeal?**

You have 180 days from the date you receive this letter.

If we do not receive your written appeal within 180 days of this letter, our claim determination will be final.

**Where do you mail or fax your written request for an Appeal?**

The Benefits Center
Appeals Unit
PO Box 9548
Portland, ME 04104-5058
Fax Number: 1-207-575-2354

Our Appeals Unit will send you a letter acknowledging receipt of your appeal including your Appeals Specialist's contact information.

**How does the Appeal process work?**

An Appeals Specialist will review your entire claim, including any new information you submitted.

**How much time does the Appeal review take?**

We want you to know that our Appeals Unit is committed to completing their review as soon as possible and will provide you with status updates every thirty days until a decision is reached.

**How to Contact Us**

We hope this letter has been clear and helpful to you.  If you have any questions or would like to follow the status of your claim, you can do so conveniently through your secure online account at www.unum.com/claims.

As a convenience, we offer a secure website at www.unum.com/claims where you have the option to:

- Go paperless and receive all correspondence electronically.
- View your benefit payment information and the current status of your claim including outstanding information.
- Sign up for direct deposit; and
- Upload documentation or provide new information to help us evaluate your claim and return to work efforts.

You may also manage your claim with the Unum Customer App.  The Unum Customer App is available for Apple and Android.

After reviewing your online account, if you have additional questions, please call us.  Our experienced representatives are available to assist you. We will identify your claim by your Social Security number or claim number, so please have one of these available when you call.

| | |
|---|---|
| Spanish: To obtain assistance in Spanish, call 1-800-858-6843. | Para obtener asistencia en Español, llame al 1-800-858-6843. |
| Chinese: To obtain assistance in Chinese, call 1-800-858-6843. | （中文）：如果需要中文的帮助，请拨打这个号码：1-800-858-6843. |
| Tagalog: To obtain assistance in Tagalog, call 1-800-858-6843. | Kung kailangan ninyo ng tulong sa Tagalog, tumawag sa 1-800-858-6843. |
| Navajo: To obtain assistance in Dine, call 1-800-858-6843. | Dinek`ehgo shika at`ohwol ninisingo, kwiijigo holne` 1-800-858-6843. |

Sincerely,

*Jenna Lacey*

Claimant Name: Parker, Tanya
Claim Number: 21070146

Jenna Lacey
Lead Benefit Specialist



202 W. MEADOW
FAYETTEVILLE, AR 72701
P 479.595.0909
F 479.595.0928

# LACY LAW FIRM

BRANDON@LACYLAWFIRM.COM ◆ WWW.LACYLAWFIRM.COM

630 S. MAIN STREET
JONESBORO, AR 72401
P 870.932.4522
F 870.932.4529

November 16, 2022

VIA FACSIMILE TO 207-575-2354

Unum – The Benefits Center
Appeals Unit
P. O. Box 9548
Portland, ME 04104-5058

       *Re:*   *Tanya Parker*
             *Claim No.: 21070146*

Dear Sir or Madam,

      Please accept this letter as a formal appeal submitted on behalf of my client, Tanya Parker, in connection with Unum's denial of her claim for long-term disability benefits. The denial, communicated by letter dated May 27, 2022, concluded that the medical records did not "clearly" support restrictions and limitations sufficient to justify a determination of disability under the applicable policy. It is evident from reviewing the claim file that Unum relied upon its internal opinions to the exclusion of Parker's own treating physician opinion. Moreover, in doing so, Unum's internal opinions required the requisite showing of "clear" support for restrictions and limitations in order to justify finding a disability. This word is nowhere in the policy, and it is not the standard under the applicable state law. For this reason, Unum's denial is arbitrary and capricious.

      At the outset, Unum apparently operated under the assumption that this is an ERISA plan. It is not. Tanya Parker worked as a licensed practitioner nurse for the Arkansas Department of Human Services. Her job duties are physical in nature, as she most often cared for patients that required lifting, carrying, turning, etc. Because her job is with the State, her plan with Unum is a government plan, which is exempt from ERISA. Consequently, Unum is not afforded the deferential standard of review under ERISA. Unum must comply with the terms of its contract according to the Arkansas state law "preponderance of the evidence" standard. Applying this standard, it is clear that, given the support of her claim by her treating pulmonologist, Dr. Ladly Abraham, the preponderance of the medical evidence in the file supports Parker's claim.

      On June 15, 2021, Parker contracted COVID. She was hospitalized for a week and was nearly intubated. She was ultimately discharged, but has had lingering symptoms thereafter. She

EXHIBIT

9

continued to experience shortness of breath, fatigue, and a cough. She was eventually referred to a pulmonologist, Dr. Abraham, who advised her to remain off work. Dr. Abraham completed an Attending Physician Statement on March 8, 2022 confirming that Parker was disabled from performing her own occupation from June 17, 2021 until an undetermined point in the future. The file was reviewed by Amanda Winkler, who concluded that restrictions and limitations were "not clearly supported," despite the opinion of Parker's treating pulmonologist.

Again, on April 25, 2022, Dr. Abraham completed a document outlining Parker's restrictions and limitations that states: "Patient to avoid any activity/exertion that is intolerable. Prolonged periods of standing/walking/lifting/pushing/pulling." Restrictions began on June 7, 2021 and ended at an undetermined period. In other words, Dr. Abraham was advising Parker to remain off work as a LPN. Once again, Winkler did not believe these medical opinions were clear and forwarded the file for an internal medical review.

Unum's in-house physician, Dr. Belanger, wrote Dr. Abraham on April 29, 2022 to outline her own differing opinions concerning the restrictions and limitations given her review of the medical records in the file. Dr. Abraham did not respond to this letter. Given the lack of response, Dr. Belanger simply concluded that Dr. Abraham's restrictions and limitations were not supported.

The file was forwarded to a Designated Medical Officer, Alan Atkinson, D.O. who concurred with Dr. Belanger's opinion. Based upon these opinions, Unum denied Parker's claim.

In an ERISA case, a treating physician's opinions are not afforded any particular deference. In a non-ERISA context, however, treating physician opinions are certainly given much greater deference by a jury than those from in-house physicians officed in other states who have never laid eyes on the patient, or than those from paid "independent" physicians who receive the majority of their income by performing identical reviews for insurance companies. If Unum does not overturn its decision, that will be the precise scenario presented to an Arkansas jury in this case.

At this time, we are submitting medical records from Arkansas Cardiology. We have also requested medical records from Central Arkansas Lung, Greenbrier Family Practice and UAMS. We will forward those records as a supplement to the formal appeal upon receipt. These records provide additional support for Parker's claim for disability and show that she remains unable to perform the material and substantial duties of her own occupation at this time.

I am confident that, weighing the opinion of Dr. Abraham against the opinions of Dr. Belanger and Dr. Atkinson, a jury will conclude that, based upon the preponderance of the evidence, Parker is precluded from performing the material and substantial duties of her own occupation. If Unum's decision is not overturned, we will have no choice but to file suit, seeking not only all benefits owed to Parker to date, but also a 12% penalty, attorney's fees, costs and interest as authorized by Arkansas law. I look forward to receiving your decision overturning the denial in the near future.

Yours truly,

Brandon W. Lacy

BWL/sc
Enclosure(s):   As stated above

cc:     Ms. Tanya Parker (via U.S. Mail)

3

Unum
Appeals Unit
PO Box 9548
Portland, ME 04104-5058
Phone: 1-800-858-6843
Fax: 207-575-2354
www.unum.com



December 22, 2022

BRANDON W. LACY
LACY LAW FIRM
630 S MAIN STREET
JONESBORO, AR 72401

RE:     Parker, Tanya
        Claim Number:        21070146
        Policy Number:       410275
        Unum Life Insurance Company of America

Unum Life Insurance Company of America completed the appeal review on your client, Tanya
Parker's Long Term Disability claim.

Please read the following pages carefully, as they will help you understand how we reached our
decision.

This letter includes the following:

- Initial Claim Decision

- The Appeal Decision

- Information that Supports the Appeal Decision

- Our Response to your Concern(s)

- Policy Provisions that apply to the Appeal Decision

- Next Steps Available

**Initial Claim Decision:**

It was determined Tanya Parker's reported disability did not extend beyond the required
elimination period (EP). The 180 day EP must be satisfied before disability benefits are
payable. The EP is June 16, 2021, through December 12, 2021.

A vocational review concluded your client's regular occupation was most consistent with the
Licensed Practice Nurse occupation eDOT# 079.374-014. The physical demands include:



EXHIBIT
tabbies
10

- Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects.
- Frequent standing, stooping, talking, handling, reaching, or reaching upward.
- Occasional sitting, walking, kneeling and crouching.

*Definitions of Frequency per The Revised Handbook for Analyzing Jobs:*
'Occasionally'= Activity or condition exists up to 1/3 of the time (0 - 2.5 hours a day in an 8-hour workday)
'Frequently' = Activity or condition exists from 1/3 to 2/3 of the time (2.5 - 5.5 hours a day in an 8-hour workday)
'Constantly' = Activity or condition exists 2/3 or more of the time (5.5+ hours a day in an 8-hour workday)

The Benefit Center considered all the available medical and file data to include updated from your treating providers. Following attempted peer contact with Dr. Abraham and two physician level reviews, it was concluded the available medical evidence and other claim file data did not support functional loss, limiting your client from performing her occupational demands as of November 30, 2021. Therefore, it was determined your client did not satisfy the definition of disability through the EP and your client's claim was closed on May 27, 2022, with no benefits payable.

**Appeal Decision:**

We determined the decision on the claim is correct. It is appropriate to uphold the prior decision on appeal.

**Information that Supports our Decision:**

On appeal, we have fully and fairly considered the issues and concerns you raised and applied the terms of the policy.

As part of the appellate review, we referred your client's claim file to an outside medical consultant, a physician board certified in Internal Medicine who independently reviewed the available medical records, and other claim file data.

We have considered your client's conditions/symptoms individually and in aggregate, as well as the opinion of her treating provider. The available medical records do not document physical, diagnostic, imaging or cognitive findings limiting your client from performing her occupational demands continuously through the EP ending December 12, 2021. While there is evidence to support restrictions and limitations through November 29, 2021, due to hospitalization and treatment for acute Covid-19 pneumonia and subsequent evaluations for symptoms of post-acute syndrome of Covid-19; the available medical evidence does not support restrictions and limitations as of November 30, 2021.

The file information documents your client needed to be off work beginning June 16, 2021, until November 29, 2021, due to acute Covid-19 infection and symptoms of post-acute syndrome and undergoing evaluation. Her complaints of chest pain, fatigue, cough, and shortness of

breath as of November 30, 2021, do not rise to a level that would preclude your client from performing her occupational demands based on the following:

> The serial physical examinations by providers have noted your client to be awake, alert, and oriented x3 and in no acute distress. Examinations have been normal.

> The examinations have not noted any tachypnea, dyspnea, or shortness of breath. Her respiratory rate and oxygen saturation levels have remained normal on room air. Your client denied supplemental oxygen since being discharged from the hospital. There was no clubbing, cyanosis, or edema.

> The examinations did not note motor weakness, decreased sensation, abnormal reflexes, impaired range of motion, imbalance, positive Romberg, antalgic gait requiring assistive devices, acute synovitis, or cerebellar abnormalities. The examinations did not note any cognitive deficits. Mood, affect, judgment, insight, and thought content were normal.

As of November 30, 2021, Dr. Abraham (pulmonologist) determined from a pulmonary standpoint your client was fine. Exercise and diet education was recommended. The pulmonary function tests (PFT's) and CT angiogram of the chest were unremarkable. The echocardiogram was normal. The CT angiogram of the coronary arteries documented mild coronary calcifications. The cardiac MRI revealed prior myocarditis. Your client's physical examinations noted normal cardiac and pulmonary findings including normal oxygen saturation levels.

While your client complained of persistent dyspnea, her PFTS were normal. A methacholine challenge test was positive, and she was placed on inhalers for asthma. A 6-minute walk test or CPET was not performed. She has not been referred to physical therapy or occupational therapy for pulmonary rehabilitation.

Our review also notes the available records did not note evaluations for autoimmune disease, autonomic dysfunction, or neuromuscular dysfunction. We acknowledge your client had tachycardia on examination; she has not been evaluated for postural orthostatic tachycardia syndrome. She has not required emergency room evaluations for chest pain, palpitations, or shortness of breath. We note she was referred for a sleep study; however, this report was not available for the appellate review.

We have considered her complaints of anxiety and depression. Your client was not referred to counseling during the EP. She also did not require intensive outpatient therapy or hospitalizations for anxiety and depression.

We also note the available diagnostic testing does not document findings to support impairment as of November 30, 2021, based on the following:

> CT angiogram of the coronary arteries dated August 31, 2021, revealed hypoventilatory changes at the lung bases with focal patchy infiltrate in the right base. There was mild dilatation of the ascending aorta and mild cardiomegaly.

> Transthoracic echocardiogram dated August 31, 2021, revealed normal left ventricular size and function. EF 55%. The right ventricle was normal.

Cardiac MRI dated September 01, 2021, revealed normal left ventricular size, wall thickness, and systolic function was normal. The right ventricle had normal size and wall thickness. The impression was that features were suggestive of possible prior myocarditis. The EF was 62%. There was no evidence of active myocardial or pericardial edema. Ascending aortic aneurysm measured 4.2 cm.

CT angiogram of the chest dated November 24, 2021, revealed no evidence of pulmonary embolic disease.

A 30-day Holter monitor dated December 2021 revealed normal sinus rhythm. The triggered events were correlated with normal sinus rhythm.

Laboratory tests dated September 10, 2021, revealed normal results.

In addition to the medical evidence above, your client's self-reported activities are not consistent with impairment or with her report of fatigue. For example, she could go to the laundromat and do her laundry, drive, cook, help with household chores, and perform her own activities of daily living.

The available medical records do not document effects from the co-morbid conditions including but not limited to hypertension, obesity, asthma, depression, and anxiety, limiting your client from performing her occupational demands, full-time as of November 30, 2021, nor documentation of side effects from medications

Based on our review, your client's disability did not extend beyond the required elimination period. Because she was not continuously disabled through the elimination period benefits are not payable.

**Policy Provisions that Apply to the Appeal Decision:**

We relied upon your client's policy when making our decision, including the provisions listed below, and the Company reserves its right to enforce other provisions of the policy.

## HOW DOES UNUM DEFINE DISABILITY?

**You are disabled when Unum determines that:**

- **you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and**
- **you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.**

**After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.**

**You must be under the regular care of a physician in order to be considered disabled.**

**The loss of a professional or occupational license or certification does not, in itself, constitute disability.**

Claimant Name: Parker, Tanya
Claim Number: 21070146

December 22, 2022
Page 5 of 6

LIMITED means what you cannot or are unable to do.

MATERIAL AND SUBSTANTIAL DUTIES means duties that:

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified.

REGULAR OCCUPATION means the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

HOW LONG MUST YOU BE DISABLED BEFORE YOU ARE ELIGIBLE TO RECEIVE BENEFITS?

You must be continuously disabled through your elimination period. Unum will treat your disability as continuous if your disability stops for 30 days or less during the elimination period. The days that you are not disabled will not count toward your elimination period.

Your elimination period is 180 days.

You are not required to have a 20% or more loss in your indexed monthly earnings due to the same injury or sickness to be considered disabled during the elimination period.

ELIMINATION PERIOD means a period of continuous disability which must be satisfied before you are eligible to receive benefits from Unum.

Next Steps Available:

If you have questions about your client's claim or this process, please call our Contact Center at 1-800-858-6843, 8 a.m. to 8 p.m. Eastern Time, Monday through Friday. Any of our experienced representatives have access to your claim documentation and will be able to assist you.

If you prefer to speak with me personally, I can be reached at the same toll-free number at extension, 55740.

| | |
|---|---|
| Spanish: To obtain assistance in Spanish, call 1-800-858-6843. | Para obtener asistencia en Español, llame al 1-800-858-6843. |
| Chinese: To obtain assistance in Chinese, call 1-800-858-6843. | （中文）：如果需要中文的帮助，请拨打这个号码：1-800-858-6843。 |
| Tagalog: To obtain assistance in Tagalog, call 1-800-858-6843. | Kung kailangan ninyo ng tulong sa Tagalog, tumawag sa 1-800-858-6843. |
| Navajo: To obtain assistance in Dine, call 1-800-858-6843. | Dinek`ehgo shika at`ohwol ninisingo, kwiijigo holne` 1-800-858-6843. |

Sincerely,

Claimant Name: Parker, Tanya
Claim Number: 21070146

December 22, 2022
Page 6 of 6

*Denise J Legendre ALHC*

Denise J Legendre ALHC
Lead Appeals Specialist